16 P.3d 45 (2000)
104 Wash.App. 338
Frank S. KING, as the personal representative of the estate of Wade B. King, and Frank S. King and Mary L. King, individually, and Tracy K. Bell, individually, and Jason King, individually, Respondents,
v.
OLYMPIC PIPELINE COMPANY, a foreign corporation; Equilon Pipeline Company, LLC, a foreign limited liability company, Defendants,
Fred Crognale, Frank Hopf, and Ron Brentson, Petitioners.
Olympic Pipe Line Company, a foreign corporation, Equilon Pipeline Company, LLC, a foreign limited liability company, and Equilon Enterprises, LLC, a foreign limited liability company, Third-Party Plaintiffs,
v.
IMCO General Construction Co., a domestic corporation, and John Doe Defendants One Through Four, Third-Party Defendants,
Bellingham Herald, Intervenor.
No. 46682-8-I.
Court of Appeals of Washington, Division 1.
December 26, 2000.
As Amended on Denial of Reconsideration February 14, 2001.
*48 Franklin L. Dennis, Robert C. Blackstone, John Wolfe, Kathryn A. Miller, Wolfe & Rodihan, James E. Lobsenz, Carney, Badley, Smith & Spellman, Laurence B. Finegold, Seattle, Michael R. Spaan, Barat M. LaPorte, Anchorage, AK, for Appellants.
David M. Beninger, Paul N. Luvera, Luvera, Barnett, Brindley, Beninger & Cunningham, Seattle, Patricia E. Anderson, Kirkland, for Respondents.
D. Murphy Evans, Adelstein, Sharpe & Serka, Bellingham, for Intervenor. *46
*47 ELLINGTON, J.
Whether to stay civil proceedings to protect a party's Fifth Amendment rights when parallel criminal proceedings are pending is a matter within the sound discretion of the trial court. No previous Washington decision *49 has set forth the competing interests to be balanced in making such determinations. Having done so, we remand for rehearing. We also address an alternative request for a protective order under CR 26(c).

FACTS
Olympic Pipeline Company (Olympic) operates a buried pipeline through which flows gasoline, diesel fuel, and jet fuel. On June 10, 1999, the pipeline ruptured, spilling thousands of gallons of gasoline into Whatcom Creek in Bellingham. Wade King and Stephen Tsiorvas, both ten years old, were playing near the creek, and a young man was fishing nearby. The gas ignited. The disaster took the lives of the boys and the young fisherman, and left a swath of destruction along the creek.
The family of Wade King (King) brought this wrongful death action against Olympic, two other pipeline companies, and three individuals. The individual defendants (Petitioners) are Fred Crognale, Olympic's president at the time of the explosion; Frank Hopf, Olympic's vice president and general manager; and Ron Brentson, Olympic's supervisor of product movement.[1]
Investigations into the cause of the tragedy began immediately. The National Transportation Safety Board is charged with determining the cause of the fire. The Department of Transportation's Office of Pipeline Safety investigated and proposed a record $3.05 million fine for safety violations. The Environmental Protection Agency, the Federal Bureau of Investigation, and the U.S. Attorney are investigating potential criminal violations of the Clean Water Act and other environmental laws.
The criminal investigations have focused in part on Petitioners. For example, within weeks of the disaster, an assistant U.S. attorney questioned Brentson's former wife about any statements Brentson had made to her concerning the incident. In July 1999, Brentson's personnel files and other documents were subpoenaed and later produced to a federal grand jury. By November 1999, numerous grand jury subpoenas had been served upon individuals believed to have knowledge regarding the incident and the operation of the pipeline. Immunity from federal prosecution was offered to and accepted by some Olympic employees in exchange for their testimony before the grand jury. Brentson supervised at least one of those employees. In December 1999, federal investigators served a search warrant and seized the section of pipe involved in the incident.
Meanwhile, this civil suit was pending. In February 2000, Petitioners moved for a limited, partial stay of discovery directed to them until December 1, 2000, the anticipated date of completion of the federal investigations. They sought a stay to preserve both the right to invoke the Fifth Amendment privilege, and the right to defend fully in the civil case. The trial court denied the motion.
The next day, the U.S. Department of Justice notified counsel for two Petitioners that the government was continuing its investigations, but was "not yet ready to resolve the issue of criminal liability with respect to their clients." The letters stated that the government planned to seek a court order to allow destructive testing of the pipe to determine the cause of the rupture, and continued, "Please inform us by close of business, February 14, 2000, if you will be opposing such a motion or if you have any other concerns about the testing proposed."[2] Petitioners *50 responded to the letter and participated in the federal court proceeding.
The federal district judge framed the issue as "whether the proposed testing may go forward consistent with the rights of potential defendants charged as a result of the grand jury investigation." In its order authorizing partial destructive testing, the district judge stated, "the United States Attorney sought this order so that potential defendants could raise any due process concerns they might have regarding the possible destruction of evidence during testing." The district judge acknowledged the circumstances were out of the ordinary: "In this unusual proceeding, the Court has considered the submissions of many potential defendants who are not `parties' in the traditional sense because they have not been and may never be indicted."
On the strength of these developments, Petitioners renewed their motion for a temporary stay of discovery directed to them from May until September 15, 2000, at which point they believed the status of the federal investigations would have clarified.[3] In the alternative, they sought a CR 26 protective order precluding dissemination to non-parties of any discovery taken from them.[4] The Bellingham Herald intervened for the purpose of opposing any protective order. After a hearing, the trial court again denied the motions. We granted discretionary review, and subsequently stayed discovery pending this opinion.[5]

DISCUSSION
A. STANDARD OF REVIEW
A court's determination on a motion to stay proceedings or grant a protective order is discretionary, and is reviewed only for abuse of discretion.[6] A trial court abuses its discretion only if its ruling is manifestly unreasonable or is based upon untenable grounds or reasons.[7] Whether a court abuses its discretion in controlling discovery depends on the interests affected and the reasons for and against the decision.[8]
While no Washington court has previously addressed the issue of a stay to protect Fifth Amendment rights when parallel civil and criminal proceedings are pending,[9] federal courts have developed a considerable body of jurisprudence for the balancing of the divergent interests involved.[10] Our review of this case law persuades us the factors considered by the federal courts supply an appropriate framework for analysis. While a proper understanding of each opinion requires close attention to its facts, the factors are sensible, if inexact, and provide for a *51 thematic approach to these issues. We therefore adopt the factors set forth here as appropriate considerations for analysis in Washington courts. Although the list is not exhaustive,[11] the parties have suggested no additional or different factors for our consideration.
Before we begin, we make three observations. First, mindful as we are that no previous Washington case has addressed this issue, we intend our discussion to have general application to requests for stays in the context of parallel proceedings. Second, our comments regarding the particulars of this case are intended to illuminate the factors for general application and to guide the court below on rehearing, not to suggest a result. Finally, we note that most of the federal cases we have reviewed discuss the balancing of interests in the context of a request to stay the entire civil proceeding or all discovery.[12] Here, the individual defendants seek only a temporary stay of discovery, and only as directed to themselves. They make no request to halt the entire litigation. This difference likely alters the balancing of certain factors.
B. STAY OF DISCOVERY
The court has inherent power to stay its proceedings where the interest of justice so requires.[13] As Justice Cardozo observed:
[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. True, the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.[14]
Petitioners requested a temporary stay, but only of discovery[15] directed to them, on grounds that participation in civil discovery may place them in jeopardy of self-incrimination in light of the ongoing federal criminal investigation. They limited their request so as to permit all other discovery to proceed, in order to minimize prejudice to King. They point out that if they fail to invoke the privilege in the civil case, it is waived, and all evidence may be used in a criminal prosecution. On the other hand, if they invoke the privilege in the civil case, the jury is entitled to draw an adverse inference from their refusal to testify,[16] and they will be effectively *52 denied the opportunity to offer a defense. In addition, they contend that by their invocation of the privilege in the civil proceedings, federal prosecutors would learn the areas of inquiry upon which they feel most vulnerablean advantage the prosecutors would not otherwise have, and should not acquire through the civil litigation.
Petitioners thus argue that under the circumstances presented here, the trial court abused its discretion in denying their motion for a temporary, limited stay. They assert that the court failed to conduct a proper balancing of all the necessary interests, and that to the extent the court balanced competing interests, errors of law tainted the analysis.
1. The Fifth Amendment Privilege-Parallel Proceedings
While courts are empowered to compel witnesses to testify, the Fifth Amendment privilege stands in opposition to that power[17] by commanding that no person "shall be compelled in any criminal case to be a witness against himself."[18] This provision of the Fifth Amendment is liberally construed.[19] The Fifth Amendment privilege permits a person to refuse to testify at a criminal trial, or to refuse to answer official questions asked in any other proceeding, where the answer might tend to incriminate him or her in future criminal proceedings.[20] The privilege extends to answers that would furnish a "link in the chain of evidence."[21]
The mere pendency of related civil and criminal proceedings does not prevent the civil proceedings from going forward. "The Constitution ... does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings."[22] But when civil and criminal proceedings arising from the same transactions or conduct are pending simultaneously, the court faces a dilemma:
On the one hand, a parallel civil proceeding can vitiate the protections afforded the accused in the criminal proceeding if the prosecutor can use information obtained from him through civil discovery or testimony elicited in the civil litigation.... On the other hand, the pendency of a parallel criminal proceeding can impede the search for truth in the civil proceeding if the accused resists disclosure and asserts his privilege against self-incrimination and thereby conceals important evidence.[23]
In the face of this dilemma, "a court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions `when the interests of justice seem[ ] to require such action.'"[24]
2. Criteria for Stay in Parallel Proceedings
In considering a stay request, federal courts begin by considering the extent *53 to which a defendant's[25] Fifth Amendment rights are implicated. Other factors the courts have identified and considered include the following:
similarities between the civil and criminal cases;
status of the criminal case;
the interest of the plaintiffs in proceeding expeditiously with litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay;
the burden which any particular aspect of the proceedings may impose on defendants;
the convenience of the court in the management of its cases, and the efficient use of judicial resources;
the interests of persons not parties to the civil litigation; and
the interest of the public in the pending civil and criminal litigation.[26]
This balancing process presents "a complex area of jurisprudence," in which "a wide array of options are available to courts in performing this balancing act."[27] The balancing must be conducted on a case by case basis "in light of the particular circumstances and competing interests involved in the case."[28]
a. Implication of the Fifth Amendment Privilege
The extent to which a party's right against self-incrimination is implicated in civil proceedings must be given "serious consideration" in the balancing of interests.[29] It is not determinative; it is "only one consideration to be weighed against others."[30]
King asserts that because no criminal indictment has yet been issued, the extent to which Petitioners' Fifth Amendment rights are implicated is "negligible." In support of this proposition, King relies upon Federal Savings and Loan Insurance Corp. v. Molinaro.[31] King's reliance is misplaced. While the Ninth Circuit noted the absence of an indictment, the court discounted Molinaro's Fifth Amendment claim because he had none. Molinaro had given a partial deposition to FSLIC attorneys without invoking his privilege, and had therefore waived it.[32] No such circumstance exists here.[33]
The absence of an indictment may sometimes make potential criminal exposure merely speculative, but here, even the federal district judge and the U.S. Attorney regard Crognale, Hopf, and Brentson as potential defendants in the criminal matters now under grand jury investigation. There seems to be no serious dispute that they are in genuine jeopardy of criminal liability under federal environmental laws.
The absence of an indictment is not without consequences. For one thing, it makes more difficult the analysis of the potential criminal jeopardy. Petitioners do not advise us of the specific sections of federal law upon which they predicate their assertion of exposure to criminal liability. While the jeopardy appears real, its scope is difficult to discern on this record. Petitioners have indicated the U.S. Attorney expects the grand jury to conclude its work shortly. At that point, a clearer picture should emerge of the extent to which Petitioners' Fifth Amendment privileges are truly implicated. (Such an understanding will also be beneficial *54 for rulings on the invocation of the privilege[34] if discovery goes forward.)
For their part, Petitioners argue that the trial court's analysis of the Fifth Amendment implications was tainted by an error of law, because the court twice expressed its belief that it could instruct the civil jury not to draw an inference from the invocation of the Fifth Amendment privilege. A ruling based on an error of law constitutes an abuse of discretion.[35]
The trial court did not definitively rule on whether it would prohibit the jury from drawing an adverse inference, but appeared to believe it could do so:
His [King's] Hobson's Choice is if he takes a deposition and all he gets is an invocation of Fifth Amendment privileges, if this court rules there's not to be an inference drawn from that, he has nothing to prepare his case for. So you both have got Hobson's Choices here and I've got to try to balance which Hobson's Choice or consider which Hobson's Choice is better than the other, I guess. I don't know.[36]
In this, the court erred. In Ikeda v. Curtis,[37] our Supreme Court held that once a witness in a civil suit has invoked his or her Fifth Amendment privilege against self-incrimination, the trier of fact is entitled to draw an adverse inference from the refusal to testify.[38] Washington courts have not addressed whether the trial court has discretion to limit the adverse inference that follows from invocation of the privilege.[39] Petitioners agree the inference is available against them, and argue the court has no discretion to lessen its impact. As a logical matter, however, the holding of Ikeda does not prohibit the usual analysis under the rules of evidence. ER 403 permits the court to exclude relevant evidence where unduly prejudicial. Whether the court would be justified in such a step at trial is, of course, entirely speculative at this stage, and this future possibility can therefore comprise no part of the court's present analysis of the factors for or against a stay. The consequences of the adverse inference that usually follow invocation of the privilege must therefore be considered in balancing the effects of going forward.
In this regard, King objects that the adverse inference is not itself a factor to be balanced, but rather is the reason for the balancing test. King is correct that the concern about invocation of the Fifth Amendment privilege in most civil cases stems from this inference, because it impairs the right of the invoking party to defend the civil claims; the caution required in the face of criminal charges may leave civil defendants unable to offer truthful testimony that would assist in defense of the civil claims. But the fact that these difficulties are an underlying reason for the balancing test is no answer to the requirement that the court must be accurate in its evaluation of available remedies.
*55 Finally, it appears the court denied the motion for a stay in part because Petitioners made no promise to waive their rights under the Fifth Amendment: "Counsel has candidly informed the court that even if action is not taken as of September 15th, that that does not mean that they would not later invoke their Fifth Amendment privilege...." We know of no authority for the proposition that a defendant must waive the Fifth Amendment privilege in order to seek protection for its exercise. There would be no point in seeking the court's protection if waiver were the condition of a temporary stay. Everyoneincluding the governmentwould simply await the waiver.
b. Similarities Between Civil and Criminal Cases
One of the most important factors in the balancing process is "the degree to which the civil issues overlap with the criminal issues,"[40] because "[i]f there is no overlap, there would be no danger of self-incrimination and accordingly no need for a stay."[41] Thus a stay is most appropriate where the subject matter of the parallel civil and criminal proceeding or investigation is the same.[42]
In some cases, a court facing a stay request will be required to analyze and compare the elements of the civil and criminal actions to establish the extent of the overlap. Here, so far as we can discern, the conduct alleged in the civil complaint is the same as that which is under investigation by the grand jury. The civil complaint alleges strict liability, negligence, and wilful misconduct. The federal Clean Water Act, which Petitioners cite as one source[43] of their concern about criminal liability, prescribes criminal penalties for unlawful discharge of petroleum products, including penalties for ordinary negligence in certain circumstances.[44]
Further, the federal district judge supervising the grand jury and the U.S. Attorney regard Petitioners as potential defendants,[45] and the grand jury has issued a subpoena for transcripts of depositions taken in the companion case to King.[46] The U.S. Attorney thus believes that evidence of criminal conduct may be found in the civil discovery. There appears thus to be complete correspondence between the civil and criminal cases. We conclude not only that Petitioners' jeopardy is genuine, but that its extent broadly coincides with the areas of civil discovery likely to be pursued.
c. Status of the Criminal Case
Another factor in considering a stay request is the status of the criminal case, particularly whether the defendants have been indicted.[47] The argument for deferring *56 civil proceedings until after completion of criminal proceedings is stronger "where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter," because the noncriminal proceeding might undermine the party's Fifth Amendment privilege against self-incrimination.[48] But as we have earlier discussed, the protections of the Fifth Amendment turn not on whether a litigant has been indicted, but on whether the litigant is in real danger of self-incrimination in a subsequent criminal proceeding. "`It is well established that the privilege protects against real dangers, not remote and speculative possibilities.'"[49] As our Supreme Court has observed, the Fifth Amendment protects against a genuinenot a fancifulhazard of self-incrimination.[50] Despite the absence of an indictment, Petitioners' jeopardy is neither fanciful nor imaginary.
King's suggestion that we adopt a bright-line rule conditioning a stay upon the presence of an indictment is contrary to both law[51] and common sense. Each case must be examined to determine the true extent of defendant's jeopardy.
Again, however, the absence of an indictment may have a relevant consequence. The status of the criminal case includes the likely speed of its resolution. Where there is not yet a formal charge, resolution of the criminal matter may be so remote it should not be awaited. On the other hand, if the resolution of criminal proceedings is close at hand, the detriments of a stay are counterbalanced by the prospect of a speedy criminal trial, and by the potential res judicata or collateral estoppel effects of resolution of common issues.[52] Here, this observation does not apply, since Petitioners do not seek a complete stay.
d. Plaintiffs' Interests and Potential Prejudice
Civil plaintiffs have a substantial interest in expeditious conduct of their litigation. That interest, and any potential prejudice from delay, must be carefully considered.[53] Delayed resolution of the civil claims is, by itself, usually a detriment. In addition, delay carries with it the possibility of lost memories, and missing witnesses.[54]
Whether delay is always prejudicial is not necessarily clear. As Judge Pollack noted in Parallel Proceedings, where there is substantial overlap, the criminal proceeding may actually benefit the civil proceeding by producing a result that completely resolves the civil liability issuesalthough the reverse is not true.[55] Resolution of the criminal case may also enhance possibilities for settlement in the civil action. Whether these potential benefits apply will depend upon the circumstances of each case. One court balanced the delay factor thusly: "[D]ue to the overlapping issues in criminal and civil trials, the criminal justice system will help safeguard the evidence, and any resulting incarceration could only serve to insure the availability of the parties. And while stale memories pose a risk, ... under settled authority the Fifth *57 Amendment is the more important consideration."[56]
The delay factor is difficult to evaluate here. Where the requested stay applies only to certain defendants and only to discovery directed to them, the possibility of lost witnesses disappears, and the problem of faded memories is confined to those who would be asserting the Fifth Amendment privilege to some (perhaps many) questions.
The trial court considered the potential prejudice to King resulting from delay, stating:
The discovery being sought is of the key individuals who would be the closest to having knowledge that may be relevant or helpful in determining the cause of the incident that happened, the explosion that happened. And the passage of five years, this court thinks, would operate to simply make memories fade and the ability to obtain information much more difficult and a witness may very well not have a recollection. The documents I understand are being provided but documents don't fill in, oftentimes, the necessary facts that a party needs for the presentation of a case.
The court's consideration of this factor is clearly proper, but the court appears to have assumed that a stay would delay all discovery for five years.[57] We must respectfully disagree, because the court has the power to control all aspects of this issue. The consequences of delay usually depend upon its duration. If a brief, limited stay produces no clarification in criminal status, and other issues have not emerged to alter the balance, the court remains free to lift the stay and proceed, or explore other means of protecting legitimate Fifth Amendment concerns.
In addition, it is not clear what importance Petitioners' testimony actually has to the resolution of King's claims. The amended complaint seeks damages under RCW 90.56.370, which provides for strict liability for all damages resulting from unlawful discharge of petroleum products into state waters. It seems unlikely that the unlawfulness of the spill is disputed, but if so, it is not clear why Petitioners' testimony is necessary to resolve the question. The importance of the discovery sought to be stayed is thus not clear on this record. By the same token, the prejudicial effect of delay of that discovery is not clear.
King asserts that consideration of prejudice to plaintiffs from delay "should involve additional constitutional emphasis," and that a stay would deny them their "constitutional right to discovery and trial without delay," relying upon Doe v. Puget Sound Blood Center.[58] There, the court held that article I, section 10[59] of the state constitution guarantees a right of access to the courts which "must be accorded a high priority in weighing the respective interests of the parties in litigation."[60] The court held that the discovery rules "recognize and implement the right of access," and "grant a broad right of discovery which is subject to the relatively narrow restrictions of CR26(c)."[61]
The discovery rules contemplate conflicts between one party's rights in the discovery process and other rights or interests, and the rules expressly grant courts discretion to balance these interests and limit conflicts.[62] The balancing factors we adopt here accord appropriate weight and priority to plaintiffs' article I, section 10 right to civil discovery.
King's right under article I, section 10 is a right to justice without unnecessary delay. Each side's right in the civil litigation *58 has equivalent constitutional foundation. "The right of a citizen to defend ... in court is corollary to the plaintiff's right to sue there."[63] These competing interests are also appropriately addressed by these balancing factors, and require no additional emphasis.
To the extent King posits that the right under article I, section 10 is superior to the right to be free from self-incrimination, King offers no authority to support such a proposition, and we reject it.
e. The Burdens on the Party Asserting the Privilege
In addition to considering the implications of the Fifth Amendment privilege, courts consider "the burden which any particular aspect of the proceedings may impose on defendants."[64] This may involve the burden associated with the inevitable diversion of resources in simultaneous defense of civil and criminal actions,[65] or the likelihood that the materials unearthed during civil discovery may eventually inure to the benefit of the government prosecution.[66]
The concern about discovery derives from the fact that the scope of civil discovery is far more broad than that allowed in criminal cases.[67] This is particularly a concern where the government is a party to the civil proceedings.[68] Courts have differed as to the importance of the discovery issue. One court commented, "[T]he incidental effect of limiting the Government's fortuitous access to information arguably relevant in the criminal case ... is not a factor which should or will influence the decision whether to grant a stay."[69] Still other courts have commented that postponement of civil proceedings is desirable to protect the integrity of the separate civil and criminal processes, lest the civil proceedings interfere with the criminal case by "churn[ing] over the same evidentiary material."[70]
Here, federal prosecutors seek to obtain the results of civil discovery by formal means. There is no indication that prosecutors seek to controlas opposed to benefit from-civil discovery. In the absence of government misconduct,[71] we do not see why an incidental benefit to the truthfinding process should be foreclosed, except to the extent it implicates Fifth Amendment rights.
Petitioners assert that discovery burdens their Fifth Amendment rights because the very invocation of the privilege may constitute a "road map" for prosecutors, and form exactly the "link in the chain" of evidence needed to prosecute them that they cannot *59 be constitutionally required to provide.[72] This concern has some force; it is surely possible that invocation of the privilege in response to particular questions in a civil case could supply an avenue for investigation by prosecutors. Whether such a scenario is likely here, given the various and extensive government investigations, is a question for the trial court.
A third possible burden may come from pretrial publicity, which may weigh either for or against a stay. In Keating, the court held that in light of the "inordinate amount" of media attention, any delay would have been detrimental to public confidence in the Office of Thrift Supervision.[73] The court cautioned, however, against giving "undue" consideration to a proceeding's impact on the public in highly publicized cases:
Governmental entities are frequently aware of the need to reassure the public that they are taking prompt action in response to a crisis. In such high visibility situations, it is especially necessary to guard the rights of defendants, and concern for the public deterrence value of an enforcement proceeding must not be allowed to override the individual defendant's due process rights.[74]
We agree with the Keating court's concern, which applies equally to high profile private actions. Here, however, Petitioners do not point to publicity except to emphasize that their every assertion of the Fifth Amendment privilege will be front page news. Whether this constitutes a burden is for the trial court to decide.
f. Convenience and Efficiency of the Court
The sixth factor is the "convenience of the court in the management of its cases, and the efficient use of judicial resources."[75] Parallel proceedings may create concerns about calendar congestion and duplicative judicial effort; the "mere possibility that a substantial amount of the court's work, if undertaken now, may shortly prove to have been unnecessary, cautions against undue haste in proceeding."[76] Simultaneous proceedings may particularly raise issues of judicial efficiency where they are conducted by different judges of the same court.[77] Some judges find this factor weighs in favor of a stay because after the criminal matter is resolved and the Fifth Amendment issue gone, civil discovery will proceed more smoothly and efficiently.[78]
Here, this factor appeared not to have influenced the court's decision. Whether a stay would reduce the court's workload or ultimately reduce the resources necessary to resolve the civil case is unclear.
g. Interests of Non-parties to Civil Litigation
Interests of persons not parties to the civil litigation tend to be discussed infrequently. The Golden Quality court gave the interests of non-party witnesses "real weight" in favor of staying civil discovery, because such persons face the severe dilemma of serious criminal penalties while having no interest in the civil litigation.[79] Partly for this reason, that court refused a request for a complete stay in a private anti-trust action, but allowed only limited discovery presenting no Fifth Amendment issues, and ordered proceedings *60 suspended altogether "as the time for the criminal trial draws near."[80]
This factor is not directly implicated here.[81] It is obvious, however, that individuals who are not parties, but who may also be targets of the grand jury investigation, are important witnesses in this litigation.[82] To avoid possibly contradictory and confusing orders on discovery, the court will likely have to consider this factor on remand.
h. Public Interest in Civil and Criminal Litigation
Senior Judge Milton Pollack of the Southern District of New York referred to the effect of a stay of a civil case upon the public interest as "perhaps the most important factor in the equation, albeit the hardest to define."[83] The parties vigorously debate the effect of this factor here. The answer lies in the meaning of "public interest" in the context of this balancing test. There are two different such interests.
The first "public interest" is not the intensity of public concern, but rather the public welfare; that is, the protection of the public from harm. Where the government brings the civil suit to enforce laws designed to protect the public, the public interest in the civil litigation has often been a compelling basis for denying a stay because of a "tangible threat of immediate and serious harm to the public at large."[84] For example, public interests considered by courts rejecting stay requests have included the need to protect consumers from misbranded pharmaceutical drugs,[85] the public interest in stable financial markets,[86] and the public interest in speedy resolution of an action to bar an individual from the federally-insured banking industry.[87]
On the other hand, where there was no indication of potential irreparable injury to pension plan beneficiaries, "Possible mismanagement of a pension fund simply does not present the same danger to the public interest as violations that other courts have found to warrant denial of a motion for a stay."[88] Similarly, a civil forfeiture action did not protect the public interest as compared to a civil enforcement action brought by a regulatory agency.[89] In some regrettable situations, where government does not or cannot act, private litigation may be the only means of addressing serious public welfare issues. But where government can and does act, no such purpose is attributable to related private litigation.
Here, it is the business of the various governmental entities to correct and prevent and protect and punish. The public interests in placing responsibility for the disaster and in protecting the community from future harm as a result of pipeline operations are being vigorously pursued by government. The interests at stake in this civil litigation are different: they are the private rights of the parties to a determination of civil liability *61 for the tragic death of a child. These are highly important, but private, interests.
This is not to suggest that the high degree of public and media attention to this litigation is misplaced. What is learned in this case may indeed shed light upon the cause of the tragedy, and even upon the means for prevention of future disasters; its outcome will certainly affect the response of the community to the tragedy. It is natural that the community views this litigation as one of the centerpieces in the aftermath of the disaster, and that the plaintiffs themselves view the public welfare as a principal objective.[90] But for purposes of analyzing the public interest factor, King's purpose is a private one.
Even where the action is purely private, however, there is a second public interest involved: the public interest in the integrity of the judicial system.[91] This aspect of the public interest is best served by a careful, open process of balancing competing interests-in other words, by the very balancing required here.
ConclusionStay
The trial court's consideration of these factors was affected by certain legal errors and misimpressions, and was incomplete. The court did not, for example, address the limited nature of Petitioners' requested stay,[92] or decide whether the civil discovery process would harm Petitioners' Fifth Amendment rights, and if so, what weight such potential prejudice should receive. It appears the court gave equal weight to King's right to expeditious resolution of the litigation as against Petitioners' Fifth Amendment rights, without determining whether Petitioners' Fifth Amendment interests are burdened by more than the adverse inference.
For these reasons, and because the trial court did not have the benefit of a Washington decision adopting and discussing these factors, we remand to provide the court an opportunity to exercise its discretion in light of this opinion.
C. CR 26 PROTECTIVE ORDER
In the absence of a stay, Petitioners sought a protective order prohibiting disclosure of their responses to discovery to any person not a party to the litigation. Under Civil Rule 26, a court may, for good cause shown, "make any order which justice requires to protect a party or person from ... undue burden, ... including ... (1) that discovery not be had; ... (4) that certain matters not be inquired into ... (6) that the contents of a deposition not be disclosed...."[93]
Restrictions on disclosure of discovery information have been sustained by the United States Supreme Court. In Seattle Times Co. v. Rhinehart,[94] the court reviewed a decision of our Supreme Court, considering whether the First Amendment prohibited confidentiality protective orders. The Court noted, "As in all civil litigation, petitioners gained the information they wish to disseminate only by virtue of the trial court's discovery processes.... A litigant has no First Amendment right of access to information made available only for purposes of trying his suit."[95] The Court went on to note the *62 usually private nature of the discovery process:
Moreover, pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law and, in general, they are conducted in private as a matter of modern practice.... [R]estraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information.[96]
The Court held that a litigant's First Amendment right to disseminate information obtained in discovery was a limited interest that could legitimately be curtailed altogether by a protection order issued for good cause.[97]
We find instructive our own court's decision in Rhinehart, discussing the need for protective orders to preserve privacy interests:
[B]y requiring a party to submit to the searching inquiries of discovery, the courts have required him to give information about himself which he would otherwise have no obligation to disclose. A realm of privacy which courts had previously left undisturbed was now opened. True, as to all information derived through these proceedings and admitted at trial, a party's interest in privacy must be sacrificed to the needs of adjudication. But as to other information which he is forced to give under the liberal rules of discovery, the effective administration of justice does not require dissemination beyond that which is needed for litigation of the case. It was the needs of litigation and only those needs for which the courts adopted this rule and demanded of the litigant a duty which would not otherwise be his. For this reason, it is proper that the courts be slow to subject a civil litigant to any exposure which he deems offensive, beyond that which serves the purpose of the rule.[98]
Both the rule and the case law thus provide a trial court with substantial latitude to decide when a protective order is appropriate and what degree of protection is required given the unique character of the discovery process.[99]
The Bellingham Herald, as intervenor, reminds us that the court's record of proceedings in a civil case is ordinarily public, and that absent a court order, a litigant is free to disseminate information gained in pretrial discovery.[100] We acknowledge these authorities, but find them of little assistance to our analysis. As to the latter proposition, it is undisputed; as to the former, it has no relevance here, since we deal not with court records but with discovery not yet taken.[101] We are mindful, however, as Judge Posner recently put it, that "parties to a lawsuit are not the only people who have a legitimate interest in the record compiled in a legal proceeding."[102]
Petitioners contend the trial court erroneously believed it lacked authority to prohibit disclosure of the contents of a deposition before the deposition was filed with the court. The record does not support this assertion. While there was considerable discussion about Petitioners' request that the court "seal" the depositions, and the court *63 said it could not do so before they were filed with the court, the debate was largely semantic. Petitioners ultimately clarified to the trial court what they were really seeking: an order preventing disclosure to non-parties. The court understood the request, weighed the competing interests, and denied the motion. The court took the view that a protective order would be premature before the privilege had been invoked in response to specific questions, noted that such an order could be sought depending on the questions asked, and ruled there was not sufficient cause for a protective order "at this point in time."
Petitioners' purpose in seeking the protection order is the same as that underlying the request for a stay: to conceal invocation of the privilege, thereby shielding from the government those areas of questioning where they feel their defense may be most vulnerable.[103] They point out that the government would ordinarily have no such information, and argue the pending civil litigation should not create an advantage for the government. In effect, they argue the invocation itself is incriminating.[104]
King responds that Petitioners' concerns are entirely speculative, and rest on the dubious hypothesis that federal prosecutors have overlooked whole areas of inquiry despite the enormous resources the government has devoted to investigating the causes of the pipeline rupture and resulting fire. Here, as in the context of the stay analysis, this question is for the trial judge to determine.
King also argues that a protective order for this purpose "undercuts the very essence and purpose underlying the protective orders," which King describes as "encouraging full disclosure of all relevant facts." It is certainly true that most protection orders in parallel proceedings are apparently so-called "quid-pro-quo" orders, in which a party answers incriminating questions under the protection of a court order prohibiting disclosure beyond the boundaries of the litigation.[105] These orders do encourage full disclosure. But they do so at considerable risk, since courts cannot grant immunity, and courts' contempt powers do not prevent inadvertent (or even intentional) violations of their orders.[106] Indeed, federal courts cannot guarantee the effectiveness of protection orders as against a grand jury subpoena. The Ninth Circuit has adopted a per se rule granting precedence to the subpoena over a CR26(c) protective order issued by a federal district judge.[107]
We cannot embrace King's narrow description of the objective of protective orders. As the U.S. Supreme Court observed in Rhinehart, modern civil discovery rules require litigants to divulge a wide range of otherwise private information, and authorize courts to protect against harmful side effects of such disclosures, including the effect of public dissemination of the information.[108] The invocation of the privilege against incrimination during the civil discovery process amounts to a disclosure of otherwise private information, and therefore logically falls within the protections of the rule.
*64 The Bellingham Herald asserts that prejudice to the public would result from such a confidentiality order, because the public, including the press, has a right "to openly administered justice" under article I, section 10 of the state constitution.[109] The Herald acknowledges that this right of public access may be limited in order to protect other interests.[110]
We observe again that the article I, section 10 right of access is recognized and implemented by the discovery rules, and thus is subject to limitations authorized by those rules,[111] which may include restrictions on dissemination of private information.[112] So long as it is issued for good cause, a protective order maintaining the confidentiality of pretrial discovery information is not a denial of public access to the courts under article I, section 10.
The Herald asserts the public's concern with the administration of justice "is especially strong in a case like this, where the civil lawsuit involves a matter of intense public interest." There is no question that the public's concern here is especially strong, and the trial court may choose to take it into account in the balancing, because of the court's own concern for public trust and confidence in the judicial process.[113]
In considering Petitioners' request for a protective order, the trial court acknowledged the validity and significance of Petitioners' concerns about exposure to criminal liability, and indicated it "would not lightly trample upon or interfere with a person's right to invoke their Fifth Amendment privilege." The court apparently gave equal weight to a variety of other interests.[114] As we have discussed earlier in the context of a stay, if Petitioners' constitutional right against self-incrimination is implicated, it weighs heavily in any balancing of interests.
The court acknowledged the competing interests between a fair trial and freedom of speech, and concluded, "Unless there is a compelling interest to refuse to permit people to speak, a protective order is not appropriate." This is not the correct test. The U.S. Supreme Court expressly refused to require that a compelling interest support a confidentiality order: "We think the [compelling interest requirement] would impose an unwarranted restriction on the duty and discretion of a trial court to oversee the discovery process."[115] Instead, the Court held the good cause requirement of CR 26 is all the First Amendment requires.[116]
The court also did not identify what prejudice King would suffer from a protective order, and we find it difficult to discern any. Under such an order, discovery would go forward. The only difference would be the extent to which its results are publicized at this stage of the litigation.
Finally, and perhaps most important, the court never determined the legitimacy of Petitioners' objective. This court will not substitute its judgment as to that question, which depends in large part on facts and circumstances best evaluated by the trial court.
*65 Conclusion-CR 26 Protective Order
When courts act on a request for a protective order to preserve a civil defendant's Fifth Amendment privilege, an on-the-record balancing of the interests involved is essential. The court must determine whether the burden identified by the party seeking the order constitutes good cause. Here, that means the court must decide whether prosecutors' knowledge that Petitioners have exercised the Fifth Amendment privilege in response to certain questions represents a potential detriment to their right to be free from self-incrimination. If so, then the practical implications of a confidentiality order must be confronted, and the benefits to Petitioners must be balanced against the rights and interests of the other parties and the public.
The discretion conferred by CR 26 affords the court many options in managing discovery. If King wishes to proceed swiftly with the discovery process, some approach to recognizing Petitioners' Fifth Amendment rights must be arrived at. On the other hand, if King can usefully proceed with other discovery, a brief stay may clarify Petitioners' status in the federal investigations, and may provide a significantly different framework for going forward. The protective order remedy can be used with some creativity, and can be utilized in preference to or following a stay. With issues as complex as these, discovery management decisions are likely to be revisited as new events or the passage of time have changed the picture.
As a final matter, we observe that in granting a protective order to a non-party witness while this review was pending, the trial court decided a matter pending on appeal in violation of RAP 7.2. We therefore vacated that order and stayed further discovery. It is of interest that the court found the order justified for apparently the same reasons advanced by Petitioners: to conceal invocation of the privilege.[117] The court distinguished the two results by pointing to Petitioners' party status. While we too discern a difference in that the non-party has no legal interest in the civil litigation,[118] we are concerned that the difference in party status, standing alone, may not justify a completely different result where constitutional rights and criminal jeopardy are at stake.

CONCLUSION
We remand for further proceedings consistent with this opinion. The stay of discovery previously entered is hereby lifted.
AGID, C.J., and COLEMAN, J., concur.
NOTES
[1] The supervisor of product movement supervises the "operations controllers" who control the remote operations of movement of the product through the pipeline.
[2] According to counsel for Brentson, it is clear that his client is a "principal target" of the federal government's ongoing investigation, as evidenced by the "unprecedented" act of a federal prosecutor

providing notice to an uncharged defendant that scientific testing was to take place and that the uncharged defendant's views on the matter were being solicited prior to and in response to a motion being filed and an Order of the Court being sought. The only reason a prosecutor would engage in this unusual procedure of bringing a nonparty before the Court, would be if the prosecutor had plans to file charges against that presently uncharged individual.
Decl. of Laurence B. Finegold, ¶11 (May 18, 2000). Counsel for Hopf expressed similar beliefs about the likelihood of indictment of his client.
[3] No such clarification appears to have emerged to date.
[4] Depositions were scheduled for June 2000.
[5] Said stay is hereby lifted.
[6] State v. Music, 79 Wash.2d 699, 716, 489 P.2d 159 (1971), judgment vacated in part, 408 U.S. 940, 92 S.Ct. 2877, 33 L.Ed.2d 764 (1972) (stay); Marine Power & Equip. Co. v. Dep't of Transp., 107 Wash.2d 872, 875, 734 P.2d 480 (1987) (protective order).
[7] State v. Stenson, 132 Wash.2d 668, 705, 940 P.2d 1239 (1997).
[8] Doe v. Puget Sound Blood Ctr., 117 Wash.2d 772, 778, 819 P.2d 370 (1991).
[9] Division Three of this court has, however, considered a related issue. In rejecting a due process challenge to the timeliness of a civil forfeiture proceeding, Division Three considered the Fifth Amendment privilege an additional reason justifying delay:

Delaying the civil proceedings until after the criminal matters are resolved avoids schedule conflicts. Moreover, allowing delays recognizes certain practical realities extant when civil drug forfeitures are invoked concurrently with criminal drug prosecutions. Rather than jeopardizing a claimant/defendant's Fifth Amendment right against self-incrimination, permitting delay of forfeiture proceedings until the conclusion of criminal prosecutions strikes a reasonable balance favoring an individual's liberty interests over his or her property interests. Escamilla v. Tri-City Metro Drug Task Force, 100 Wash.App. 742, 750, 999 P.2d 625 (2000).
[10] See, e.g., Keating v. Office of Thrift Supervision, 45 F.3d 322 (9th Cir.1995), cert. denied, 516 U.S. 827, 116 S.Ct. 94, 133 L.Ed.2d 49 (1995); Federal Sav. and Loan Ins. Corp. v. Molinaro, 889 F.2d 899 (9th Cir.1989); Afro-Lecon, Inc. v. United States, 820 F.2d 1198 (Fed.Cir.1987); Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc., 87 F.R.D. 53 (E.D.Pa.1980).
[11] Molinaro, 889 F.2d at 902-03.
[12] We have located two cases discussing partial discovery stays. In Paine, Webber, Jackson & Curtis Inc. v. Malon S. Andrus, Inc., 486 F.Supp. 1118, 1119 (S.D.N.Y.1980), the federal district court regarded the limited nature of the request as a disincentive to stay proceedings because of the court's belief that interim discovery would not bind the defendants as to whom the stay pertained. The precise nature of the request in Paine is unclear, but this concern does not exist here, since Petitioners specifically propose that discovery continue, and seek to avoid only making their own responses. In Golden Quality, 87 F.R.D. at 58-59, the district court denied a complete stay of proceedings but sua sponte granted a partial limited stay.
[13] Landis v. North Am. Co., 299 U.S. 248, 254-55, 57 S.Ct. 163, 81 L.Ed. 153 (1936); see also Lloyd v. Superior Ct. for Walla Walla County, 42 Wash.2d 908, 909, 259 P.2d 369 (1953).
[14] Landis, 299 U.S. at 254-55, 57 S.Ct. 163 (citations omitted).
[15] Because the stay request relates only to discovery, the court's powers under CR 26 are also implicated. Under that rule, a court may, for good cause shown, "make any order which justice requires to protect a party or person from... undue burden ..., including ... (1) that the discovery not be had[.]" CR 26(c). We believe the better approach in considering a discovery stay request founded on Fifth Amendment concerns in parallel proceedings is to utilize the factors regarding stays, because they provide the court with guidance specific to the Fifth Amendment context. The court can easily take into account the fact that the requested stay is limited in scope. The parties here have briefed the issue on the premise that the stay factors apply, and the trial court so considered it.
[16] Ikeda v. Curtis, 43 Wash.2d 449, 458, 261 P.2d 684 (1953); Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976).
[17] State v. Parker, 79 Wash.2d 326, 331, 485 P.2d 60 (1971).
[18] U.S. CONST. amend. V. The Fifth Amendment was made applicable to the states through the Fourteenth Amendment to the U.S. Constitution. State v. King, 130 Wash.2d 517, 523, 925 P.2d 606 (1996).
[19] Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).
[20] King, 130 Wash.2d at 523-24, 925 P.2d 606 (citing Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)). "There is no blanket Fifth Amendment right to refuse to answer questions based on an assertion that any and all questions might tend to be incriminatory. The privilege must be claimed as to each question and the matter submitted to the court for its determination as to the validity of each claim." Eastham v. Arndt, 28 Wash.App. 524, 532, 624 P.2d 1159 (1981).
[21] Hoffman, 341 U.S. at 486, 71 S.Ct. 814.
[22] Securities & Exch. Comm'n v. Dresser Indus., Inc., 628 F.2d 1368, 1375 (D.C.Cir.1980) (en banc), cert. denied, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980); see also United States v. Kordel, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) (simultaneous civil and related criminal proceedings do not constitute unfairness and want of consideration for justice so as to require reversal of a criminal conviction).
[23] Parallel Civil and Criminal Proceedings, 129 F.R.D. 201, 202 (1990) (Pollack, J.) (hereinafter, "Parallel Proceedings").
[24] Dresser, 628 F.2d at 1375 (quoting Kordel, 397 U.S. at 12 n. 27, 90 S.Ct. 763) (alteration in original).
[25] In most cases, as here, the party asserting the privilege is a defendant. We do not address what differences may arise where the party asserting the privilege is a plaintiff, but we note that the Fifth and Federal Circuits have held no meaningful distinction exists. See Wehling v. Columbia Broadcasting Sys., 608 F.2d 1084, 1089 n. 10 (5th Cir.1979); Afro-Lecon, 820 F.2d at 1206.
[26] Keating, 45 F.3d at 324-25; Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc., 886 F.Supp. 1134, 1139 (S.D.N.Y.1995).
[27] State ex rel. Wright v. Stucky, 205 W.Va. 171, 517 S.E.2d 36, 41 n. 7 (1999).
[28] Molinaro, 889 F.2d at 902.
[29] White v. Mapco Gas Prods., Inc., 116 F.R.D. 498, 502 (E.D.Ark.1987); Brock v. Tolkow, 109 F.R.D. 116, 120 (E.D.N.Y.1985).
[30] Keating, 45 F.3d 322 at 326.
[31] 889 F.2d 899 (9th Cir.1989).
[32] Molinaro, 889 F.2d at 903.
[33] The parties dispute whether one or more of the Petitioners have waived the privilege. This matter remains for resolution by the trial court.
[34] The procedure for ruling on the propriety of an invocation of a Fifth Amendment privilege is ordinarily an in camera proceeding on a closed record. See Seventh Elect Church in Israel v. Rogers, 34 Wash.App. 105, 114-15, 660 P.2d 280 (1983); Eastham 28 Wash.App. at 533-34, 624 P.2d 1159.
[35] Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 339, 858 P.2d 1054 (1993).
[36] When the court denied the Petitioners' first motion for a stay of discovery, the court stated:

This court is not ruling in any way as to whatever inferences, if any, may or may not be permitted by the answers. But I'm without sufficient facts to satisfy me at this point in time without specific questions and without the invocation of the rights to know that it's even going to be an issue at this point. Counsel has indicated it will be. We'll have to take that as it comes.
Again, I'm not ruling on what inferences may or may not be permitted from this. That's a matter for future hearing and a future decision.
[37] 43 Wash.2d 449, 261 P.2d 684 (1953).
[38] 43 Wash.2d at 458, 261 P.2d 684; see also Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify...."); 8 C. Wright, R. Miller & R. Marcus, Federal Practice and Procedure § 2018, at 290-93 (1994).
[39] For a discussion of this issue generally, see Robert Heidt, The Conjurer's CircleThe Fifth Amendment Privilege in Civil Cases, 91 YALE L.J. 1062 (1982). The parties do not brief this issue, and we do not decide it.
[40] Parallel Proceedings, 129 F.R.D. at 203. For some reason, this factor is not included in the Ninth Circuit's analysis. See Keating, 45 F.3d at 324-325; Molinaro, 889 F.2d at 903.
[41] Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc., 886 F.Supp. 1134, 1139 (S.D.N.Y.1995) (comparing civil complaint and criminal indictment to determine if wrongful conduct alleged is the same); Volmar Distributors, Inc. v. New York Post Co., Inc., 152 F.R.D. 36, 39 (S.D.N.Y.1993).
[42] United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 811 F.Supp. 802, 806 (E.D.N.Y.1992).
[43] At oral argument, counsel for petitioners also cited potential criminal charges under unspecified federal environmental laws for "conduct knowing of a likelihood of harm to another."
[44] See 33 U.S.C. § 1319(c); United States v. Hanousek, 176 F.3d 1116, 1121 (9th Cir.1999) (operator of backhoe ruptured pipeline; Clean Water Act is public welfare statute and imposes criminal liability for ordinary negligence).
[45] Petitioners argue that the trial court abused its discretion in denying their second request for a stay by failing to consider new evidence of the status of criminal proceedingsin particular, the several references to them as potential defendants. We reject this contention. The court did not fail or refuse to consider the new information. The mere fact that the court said, in essence, that the new evidence changed nothing, does not establish an abuse of discretion.
[46] The family of the second of the ten-year-old victims, Stephen Tsiorvas, also filed a substantially identical wrongful death action. Dahlen v. Olympic Pipe Line Co., No. 99-2-014687-1 (Whatcom Cty. Sup.Ct.). The parties are represented by the same counsel, and have stipulated that orders entered by this court will apply to both cases.
[47] See, e.g., Trustees, 886 F.Supp. at 1139-40; Parallel Proceedings, 129 F.R.D. at 205.
[48] Securities & Exch. Comm'n v. Dresser Indus., Inc., 628 F.2d 1368, 1375-76 (D.C.Cir.1980). See also Molinaro, 889 F.2d at 903; United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 811 F.Supp. 802 (E.D.N.Y.1992).
[49] Seventh Elect Church in Israel v. Rogers, 34 Wash.App. 96, 660 P.2d 294 (1983) (quoting Zicarelli v. New Jersey State Comm'n of Investigation, 406 U.S. 472, 478, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972)).
[50] State v. Parker, 79 Wash.2d 326, 332, 485 P.2d 60 (1971).
[51] See, e.g., Kashi v. Gratsos, 790 F.2d 1050, 1057 (2d Cir.1986); United States v. Certain Real Property, 751 F.Supp. 1060, 1063 (E.D.N.Y. 1989); Brock v. Tolkow, 109 F.R.D. 116, 119-20 (E.D.N.Y.1985).
[52] See Parallel Proceedings, 129 F.R.D. at 203-04.
[53] Molinaro, 889 F.2d at 902-03; see also Keating, 45 F.3d at 324-25.
[54] See, e.g., Clinton v. Jones, 520 U.S. 681, 707-08, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); Avant! Corp. v. Superior Ct. of Santa Clara County, 79 Cal.App.4th 876, 94 Cal.Rptr.2d 505, 512 (2000).
[55] Parallel Proceedings, 129 F.R.D. at 204.
[56] Volmar, 152 F.R.D. at 40 (citing Vardi Trading Co. v. Overseas Diamond Corp., 1987 WL 17662 at *2 (S.D.N.Y. Sept.23, 1987); Certain Real Property, 751 F.Supp. at 1063; Tolkow, 109 F.R.D. at 121; Dienstag v. Bronsen, 49 F.R.D. 327, 329 (S.D.N.Y.1970)); see also White v. Mapco Gas Prod., Inc., 116 F.R.D. 498, 502 (E.D.Ark. 1987).
[57] The parties advised the court, as they have advised us, that the statute of limitations for the criminal matters is five years.
[58] 117 Wash.2d 772, 819 P.2d 370 (1991).
[59] Article I, section 10 of the state constitution provides: "Justice in all cases shall be administered openly, and without unnecessary delay."
[60] Doe, 117 Wash.2d at 783, 819 P.2d 370.
[61] Doe, 117 Wash.2d at 782, 819 P.2d 370.
[62] CR 26.
[63] Degen v. United States, 517 U.S. 820, 828, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996).
[64] Molinaro, 889 F.2d at 903. Some courts consider the Fifth Amendment implications under this heading. See, e.g., White, 116 F.R.D. at 502.
[65] See e.g., Keating, 45 F.3d at 325; Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc., 87 F.R.D. 53, 56 (E.D.Pa.1980); White, 116 F.R.D. at 502; Digital Equip. Corp. v. Currie Enterprises, 142 F.R.D. 8, 14 (D.Mass.1991). Petitioners do not voice concern about a diversion of their resources, but we note that the burden of strained financial resources has been found not to outweigh other interests that favor proceeding expeditiously.
[66] See e.g., Golden Quality, 87 F.R.D. at 57; Digital, 142 F.R.D. at 14.
[67] See Afro-Lecon, Inc. v. United States, 820 F.2d 1198, 1203-04 (Fed.Cir.1987). For example, a party to a civil action may depose all parties and any other person necessary to obtain testimony about the relevant subject matter. Afro-Lecon, 820 F.2d at 1203-04. But federal criminal rules permit depositions only in "exceptional circumstances" and "in the interests of justice." Afro-Lecon, 820 F.2d at 1203; FED.R.CR.P. 15.
[68] See, e.g., Gordon v. Fed. Deposit Ins. Corp., 427 F.2d 578, 580 (D.C.Cir.1970); Golden Quality, 87 F.R.D. at 57.
[69] Golden Quality, 87 F.R.D. at 57; see also Digital, 142 F.R.D. at 14.
[70] See e.g., Afro-Lecon, 820 F.2d at 1204 (quoting Peden v. United States, 206 Ct.Cl. 329, 512 F.2d 1099, 1103 (1975)). See also United States v. LaSalle Nat'l Bank, 437 U.S. 298, 311-12, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) (noting policy interest against broadening the Justice Department's right of criminal discovery and against infringing on the role of the grand jury as the principal tool of criminal accusation).
[71] Afro-Lecon, 820 F.2d at 1203 ("The broad scope of civil discovery may present to both the prosecution, and at times the criminal defendant, an irresistible temptation to use that discovery to one's advantage in the criminal case.").
[72] The Federal Circuit recognized this danger, noting that given the broad scope of civil discovery, a party forced to refuse to answer individual questions is "revealing his weak points to the criminal prosecutor," creating a "link in the chain" of evidence not available otherwise. The court noted that the questions themselves could form a "link in the chain" of evidence needed for prosecution, and therefore implicate the privilege. Afro-Lecon, 820 F.2d at 1203 (citing Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)).
[73] Keating, 45 F.3d at 326.
[74] Keating, 45 F.3d at 326.
[75] Molinaro, 889 F.2d at 903.
[76] Golden Quality, 87 F.R.D. at 57 (factor weighs in favor of stay of private anti-trust action).
[77] See, e.g., Golden Quality, 87 F.R.D. at 57.
[78] See White, 116 F.R.D. at 502; Golden Quality, 87 F.R.D. at 58; see also Avant! Corp. v. Superior Ct. of Santa Clara County, 79 Cal.App.4th 876, 94 Cal.Rptr.2d 505, 512 (2000).
[79] Golden Quality, 87 F.R.D. at 58.
[80] Golden Quality, 87 F.R.D. at 58-59; see also White, 116 F.R.D. at 503 (burden on non-parties is an "important factor in favor of staying civil discovery").
[81] We note that King asserts a stay would adversely affect the rights of third party defendant IMCO. We decline to consider this argument, since IMCO is a party and makes no such argument on its own behalf.
[82] While this appeal was pending, the trial court granted a protective order to conceal the invocation of a non-party witness' Fifth Amendment privilege. We vacated that order, and stayed all discovery, pending this opinion. We address the protection order infra.
[83] Parallel Proceedings, 129 F.R.D. at 205.
[84] Brock v. Tolkow, 109 F.R.D. 116, 120 (E.D.N.Y.1985).
[85] United States v. Kordel, 397 U.S. 1, 11, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970).
[86] Securities & Exch. Comm'n v. Dresser Indus., Inc., 628 F.2d 1368, 1380 (D.C.Cir.1980) ("For the SEC to stay its hand might well defeat its purpose.").
[87] Keating, 45 F.3d at 326.
[88] Brock, 109 F.R.D. at 120.
[89] United States v. Certain Real Property, 751 F.Supp. 1060 (E.D.N.Y.1989); see also Golden Quality, 87 F.R.D. at 58 ("[T]he public interest in the vigorous prosecution of private anti-trust claims must be less acute where, as here, the United States has decided to devote a part of its prosecutorial resources to bringing a criminal action.").
[90] In their first amended complaint for wrongful death, by way of relief, plaintiffs claim "the right to find out why their son ... was wrongfully burned to death, ... the right to require the defendants to answer questions under oath and to disclose all facts and knowledge of this occurrence,... the right to recover all remedial action costs to identify, eliminate or minimize any threat to human health or the environment" and the right to "injunctive relief to safeguard the public from further exposure to hazardous or toxic waste...."
[91] See Avant!, 94 Cal.Rptr.2d at 513 ("Clearly, the public has a significant interest in a system that encourages individuals to come to court for the settlement of their disputes.").
[92] We are cognizant that the time needed for our review has accomplished almost the entirety of Petitioners' original request, and emphasize that the court is fully entitled to recognize that fact on remand.
[93] CR 26(c) (emphasis added).
[94] 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), cert. denied, 467 U.S. 1230, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984).
[95] Rhinehart, 467 U.S. at 32, 104 S.Ct. 2199.
[96] Rhinehart, 467 U.S. at 33, 104 S.Ct. 2199 (citations omitted).
[97] Rhinehart, 467 U.S. at 37, 104 S.Ct. 2199.
[98] Rhinehart v. Seattle Times Co., 98 Wash.2d 226, 236, 654 P.2d 673 (1982), aff'd, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).
[99] Marine Power & Equipment Co. v. State Dep't of Transportation, 107 Wash.2d 872, 875, 734 P.2d 480 (1987) (citing Rhinehart, 467 U.S. at 36, 104 S.Ct. 2199).
[100] See San Jose Mercury News, Inc. v. U.S. Dist. Ct., 187 F.3d 1096, 1102 (9th Cir.1999) (acknowledging right of prejudgment access to civil court documents grounded in federal common law and FRCP 26(c)); see also Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 780-81 (1st Cir.1988), cert. denied, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989).
[101] The question of whether court records can be sealed has been repeatedly addressed by our courts. See, e.g., Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993).
[102] Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co., 178 F.3d 943, 944 (7th Cir. 1999).
[103] See Afro-Lecon v. United States, 820 F.2d 1198, 1203 (Fed.Cir.1987).
[104] If so, the request is not premature; a protection order can hardly offer effective protection after the fact.
[105] See, e.g., Martindell v. Int'l Telephone and Telegraph Corp., 594 F.2d 291, 296-97 (2d Cir. 1979).
[106] See Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc., 87 F.R.D. 53, 58 (E.D.Pa. 1980).
[107] See In re Grand Jury Subpoena Served on Meserve v. Janet Greeson's A Place For Us, Inc., 62 F.3d 1222, 1227 (9th Cir.1995). The federal circuits are split on this issue. Compare In re Grand Jury Subpoena, 836 F.2d 1468 (4th Cir. 1988) (adopting per se precedence of grand jury subpoena over protective order), cert. den., 487 U.S. 1240, 108 S.Ct. 2914, 101 L.Ed.2d 945 (1988) and In re Grand Jury Proceedings v. United States, 995 F.2d 1013 (11th Cir.1993) (adopting Fourth Circuit's per se rule) with In re Grand Jury Subpoena, 945 F.2d 1221 (2d Cir.1991) (rejecting per se supremacy of grand jury subpoena over protective order) with In re Grand Jury Subpoena, 138 F.3d 442 (1st Cir.1998) (adopting "modified per se rule"), cert. denied, 524 U.S. 939, 118 S.Ct. 2345, 141 L.Ed.2d 716 (1998). Petitioners believe that principles of federalism require that a state court protective order prevail over a federal subpoena. No court has yet decided the issue.
[108] Rhinehart, 467 U.S. at 35, 104 S.Ct. 2199.
[109] Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 209-10, 848 P.2d 1258 (1993).
[110] See Eikenberry, 121 Wash.2d at 210, 848 P.2d 1258; Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 37, 640 P.2d 716 (1982).
[111] Doe, 117 Wash.2d at 780-81, 819 P.2d 370.
[112] CR 26; Rhinehart, 467 U.S. at 37, 104 S.Ct. 2199.
[113] The public concern here is different from the public interest factor discussed in the context of a stay. There, the issue is delay, and its potential effect on the protection of the public welfare must be considered. Here, the question is whether to restrict dissemination of information that comes to light during the discovery process. Such a restriction in a protective order, if justified, could be either temporary or permanent. In the context of an order issued to protect fifth amendment concerns in parallel proceedings, the need for a restriction will likely often be only temporary.
[114] The trial court stated: "But from the legal standpoint ... this court is as concerned about the rights in civil litigation as well as the rights in criminal litigation and the public's right to pursue criminal charges if necessary and the public's right to get their civil disputes resolved." (It is not clear why the court mentioned the "public's right to pursue criminal charges" since that interest is not one the civil court acts to protect.)
[115] Rhinehart, 467 U.S. at 31, 104 S.Ct. 2199.
[116] Rhinehart, 467 U.S. at 37, 104 S.Ct. 2199.
[117] The court was apparently concerned about embarrassment to the witness; there appears to have been no emphasis placed upon the risk emphasized by Petitioners (that prosecutors will learn to which questions the privilege was invoked).
[118] See discussion supra part B, section 2, sub-section g.