# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ALAN CHAFFEE, an individual; JEANNE
DeMUND, an individual; YUPING CHEN, an
individual; MATTHEW WAHLMAN, an
individual; LAIRD DEVICK, an individual;
ASH HANLON, an individual; MIKE
SCHEFFLER, an individual; MICHAIL
WILSON, an individual; NATHANIEL
HEATHCOTE, an individual; PETER
HEATHCOTE, an individual; and TODD
HAGER, an individual,

Respondents,

v.

KELLER ROHRBACK LLP, a Washington
limited liability partnership; ROBERT S. OVER,
an individual; GLEN P. GARRISON and DOES
1-50;

Appellants.

_____

PACIFIC REALTY ADVISORS, LLC, AS
GENERAL RECEIVER FOR FAIRPLAY
FINANCIAL, INC., AND FAIRPLAY
FUNDING NW, LLC,

Respondents,

v.

KELLER ROHRBACK, LLP, ROBERT OVER,
and GLEN GARRISON,

Appellants.

No. 76491-8-I

DIVISION ONE

PUBLISHED OPINION

FILED: August 7, 2017

DWYER, J. — Pacific Realty Advisors, as general receiver for Fairplay Financial, Inc. (collectively Fairplay), and 11 individual investors (Investors) sued Keller Rohrback, LLP and its managing partners, Glen Garrison and Robert Over (collectively Defendants), for legal malpractice related to the acquisition of a bank. After the separate civil suits commenced, Defendants learned of an ongoing federal criminal investigation into the acquisition. Believing that they were also subjects of the criminal investigation, Defendants moved for a discovery stay in the civil proceeding pending the resolution of the criminal investigation. The trial court denied the motion. After discovering new information relating to the criminal investigation, Defendants moved for a six-month discovery stay. The renewed motion was denied. We granted discretionary review and now reverse the trial court's order denying the motion to stay.

I

This matter relates back to Fairplay's desire to invest in Hometown National Bank (the Bank)—a small, one-branch bank in Longview, Washington. In 2012, Fairplay retained Keller Rohrback to address certain regulatory issues relating to the investment. Keller Rohrback advised Fairplay that Fairplay itself could not acquire the Bank. In lieu of Fairplay acquiring the Bank directly, certain investors decided to pursue the acquisition themselves—all of whom were owners, officers, board members, or investors in Fairplay. Garrison advised Fairplay that the investment could not come from Fairplay itself: "For example,

Fairplay cannot loan the money to the investors. Or at least, we would have to disclose this and I think it would put an end to the application."

Contrary to Garrison's advice, Fairplay elected to loan money to the Investors and present the aggregated funds as individual investments. Bill Widmer, who at that time served as president and chief executive officer of Fairplay, instructed the Investors to conceal this fact when filling out required documentation. Widmer later stated, "In my mind, I believed the loan back to the investors from Fairplay achieved the same result (i.e., that the money for all practical purposes was that of the investors), but I never informed Mr. Garrison of this, and I asked the investors not to disclose this arrangement on the regulatory forms that they were filling out." Six months after the Investor's acquisition of the Bank, Widmer instructed the Investors to execute false promissory notes in favor of Fairplay.

Prior to the acquisition, Garrison circulated an escrow agreement that listed Fairplay as signatory. After some of the Investors signed the escrow agreement, Garrison purportedly deleted Fairplay as a signatory and informed Widmer—but not the Investors—of the change. Garrison submitted the new escrow agreement to the Office of the Comptroller of the Currency (OCC) for approval. Following an investigation led by the OCC, Fairplay brought suit against Defendants for legal malpractice and other claims.

In December 2015, counsel for Fairplay informed counsel for Defendants that Fairplay was cooperating with the Federal Bureau of Investigation (FBI) and the United States Attorneys' Office (USAO) in connection with an investigation

into the Bank acquisition. In early 2016, counsel for the receiver also informed counsel for Defendants of the criminal inquiry into the Bank acquisition.

In July 2016, the USAO e-mailed Fairplay to request a copy of the August 21, 2013 Bank board minutes. The subject matter of that board meeting included attorney Garrison's views on the bank acquisition. A copy of the e-mail was sent to Defendants. In December 2016, counsel for Fairplay sent an e-mail to counsel for Defendants stating that an FBI agent planned to attend Garrison's deposition. Following receipt of this e-mail, Defendants informed Fairplay that the Garrison deposition would be rescheduled. Counsel for Defendants subsequently spoke with FBI Special Agent Ben Williamson, who confirmed that he planned on attending the Garrison deposition in an "official capacity," but declined to further elaborate.

Defendants moved to stay the deposition "due to an ongoing parallel criminal investigation." The trial court performed the required Olympic Pipeline[1] balancing test on the record, denied the motion, and ordered Garrison to appear for the deposition.

Garrison and Over subsequently retained independent criminal counsel, who then met with two Assistant United States Attorneys (AUSAs) to discuss the criminal investigation into the Bank acquisition. The AUSAs informed Defendants' criminal counsel that the government had yet to determine who, if anyone, would face charges. The AUSAs informed counsel that Garrison and Over "were not being viewed as mere witnesses" and that the government's

---

[1] King v. Olympic Pipeline Co., 104 Wn. App. 338, 16 P.3d 45 (2000).

investigation should be completed within six months. A subsequent e-mail to Defendants' criminal counsel from AUSA Susan Roe stated that the USAO "could not commit" to whether Defendants were viewed "solely as witnesses."

Criminal counsel for Defendants then discovered documents establishing that Fairplay itself had contacted the USAO to refer Garrison and Over for criminal investigation relating to the Bank acquisition. Criminal counsel for Garrison advised him that he should assert his Fifth Amendment privilege and decline to answer any questions related to the Bank acquisition during the civil proceedings.

Based on counsel's newly discovered evidence, Defendants filed an emergency motion to stay the trial court's order compelling Garrison to appear for deposition and filed a renewed request to stay discovery.[2] Defendants' renewed motion asked for a limited discovery stay of six months. The trial court denied the Defendants' renewed motion:

> The Court, applying the factors in <u>King v. Olympic Pipeline</u> to the present motion, finds that the status and potential duration of any criminal investigation into Defendants' actions remains unknown, the similarity of any possible criminal investigation to the pending civil cases is unknown, Plaintiff and the Fairplay Receivership creditors will be significantly prejudiced by an indefinite stay of the pending actions, Defendants can point to no significant or unique prejudice in proceeding with the depositions, granting the requested stay will result in waste of judicial resources, the interest of nonparties favors denying the requested stay, and the equities of the case favor denying the requested stay.

Defendants filed a motion for discretionary review in this court. Our commissioner granted an emergency motion to temporarily stay Garrison's

---

[2] Styled as a "motion for reconsideration."

deposition and expedited the motion for discretionary review. After hearing argument on the motion, the commissioner granted discretionary review and set the matter for consideration by a panel on the merits. Having had the benefit of the parties' briefs and oral argument, we now remand this matter for the entry of a discovery stay.

## II

As a preliminary matter, it is necessary to clarify the nature of Defendants' renewed motion.

Following the trial court's denial of Defendants' first motion to stay discovery, Defendants filed an emergency motion "(1) to stay order compelling depositions and (2) for reconsideration of order denying defendants' motion to stay depositions." Although Defendants characterized this motion as a motion "for reconsideration," the motion did not cite to or discuss the requirements of Civil Rule (CR) 59.

CR 59 provides, in pertinent part,

> **(a) Grounds for New Trial or Reconsideration.** On the motion of the party aggrieved, a verdict may be vacated and a new trial granted to all or any of the parties, and on all issues, or on some of the issues when such issues are clearly and fairly separable and distinct, or any other decision or order may be vacated and reconsideration granted. Such motion may be granted for any one of the following causes materially affecting the substantial rights of such parties:
>
> . . .
>
> (4) Newly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at the trial;
>
> . . .
>
> **(b) Time for Motion; Contents of Motion.** A motion for a new trial or for reconsideration shall be filed not later than 10 days after the entry of the judgment, order, or other decision. The motion shall be noted at the

time it is filed, to be heard or otherwise considered within 30 days after the entry of the judgment, order, or other decision, unless the court directs otherwise.

On appeal, Fairplay and the Investors assert that Defendants' renewed motion failed to comply with the requirements of CR 59. Specifically, Fairplay and the Investors assert that (1) Defendants' renewed motion was untimely because it was filed more than 10 days following the trial court's order denying the original motion, and (2) Defendants failed to properly establish that the motion was supported by newly discovered evidence that could not have been previously discovered with due diligence.

Fairplay's and the Investors' assertions are without merit, as their contentions are at odds with our Supreme Court's decision in In re Detention of Williams, 147 Wn.2d 476, 491-92, 55 P.3d 597 (2002). In that case, the State sought an order to compel a CR 35 mental examination of the respondent. The trial court denied the motion. The State later renewed the motion and the trial court again denied the request. The State moved for discretionary review, which was granted. Williams, 147 Wn.2d at 481-82.

Williams argued that the State failed to timely appeal the denial of its renewed motion pursuant to the time limitation in CR 59(b). The Supreme Court rejected that argument:

> CR 59(b) explicitly applies to a motion for reconsideration filed *after the entry of judgment*. In the matter before us, the State filed a renewed motion for CR 35 examination and then sought interlocutory review of the decision denying that motion. The State's notice for discretionary review was filed within the time allowed under RAP 5.2(b), the applicable rule. The Court of Appeals did not err in granting review of the trial court's order denying the State's renewed motion for CR 35 examination.

-7-

Williams, 147 Wn.2d at 491-92.[3]

The Supreme Court's conclusion is evidenced by both the juxtaposition of CR 59 within the Superior Court Civil Rules and by the context of the rule itself. CR 59 is included in chapter 7 of the Superior Court Civil Rules—Judgment (Rules 54-63). The other rules within chapter 7 include CR 54, dealing with judgments and costs; CR 55, dealing with default judgments; CR 56, dealing with summary judgments; CR 57, dealing with declaratory judgments; CR 58, dealing with the entry of judgments; CR 60, dealing with relief from a judgment or order; and CR 62, dealing with a stay of proceedings to enforce a judgment. The surrounding civil rules thus address judgments and final orders. All of these rules deal either with the entry of final judgments or posttrial matters.

The language of CR 59 itself is consistent with this theme. Although CR 59 permits reconsideration of "any . . . decision or order," this language is informed by the context of the rule and the surrounding language. Rather than contemplating any order occurring prior to or during trial, CR 59 deals exclusively with judgments and orders entered *following a verdict*. Causes for granting reconsideration include:

> (1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was *prevented from having a fair trial*;
> (2) Misconduct of prevailing party or jury; and whenever any one or more of the jurors shall have been induced to assent to any *general or special verdict* or to a finding on any question or questions submitted to the jury by the court, other and different

---

[3] Although the Supreme Court described CR 59 as applying only after judgment, we recognize that CR 59 may also apply following a verdict but preceding the entry of the judgment, as contemplated by the rule itself. See, e.g., CR 59(2). The salient point is that CR 59 applies only to posttrial proceedings.

from the juror's own conclusions, and arrived at by a resort to the determination of chance or lot, such misconduct may be proved by the affidavits of one or more of the jurors;

. . .

(4) Newly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced *at the trial*;

(5) Damages so excessive or inadequate as unmistakably to indicate that *the verdict* must have been the result of passion or prejudice;

(6) *Error in the assessment of the amount of recovery* whether too large or too small, when the action is upon a contract, or for the injury or detention of property;

(7) That there is no evidence or reasonable inference from the evidence to justify *the verdict* or the decision, or that it is contrary to law.

CR 59 (emphasis added).

Here, Defendants' renewed motion was not subject to the requirements of a CR 59 motion for reconsideration. The trial court's order denying Defendants' first motion was not a final order terminating the dispute, so as to fall within CR 59, but, rather, was merely an interlocutory order subject to review and revision by the court as appropriate.

An interlocutory order is "'one which does not finally determine a cause of action but only decides some intervening matter pertaining to the cause, and which requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.'" Alwood v. Aukeen Dist. Court Comm'r Harper, 94 Wn. App. 396, 400, 973 P.2d 12 (1999) (quoting BLACK'S LAW DICTIONARY 815 (6th ed. 1990)). Interlocutory orders are not appealable, as "permitting a trial court to correct any mistakes prior to entry of final judgment serves the interests of judicial economy." Alwood, 94 Wn. App. at 400-01. Indeed, the authority of trial courts to revisit interlocutory orders "allows them to correct not only simple

-9-

mistakes, but also decisions based on shifting precedent, rather than waiting for the time-consuming, costly process of appeal." United States v. Martin, 226 F.3d 1042, 1049 (9th Cir. 2000).

CR 59 is not applicable to such interlocutory orders. Williams, 147 Wn.2d at 491. Rather, such orders—not being final orders—are subject to discretionary review. King v. Olympic Pipeline Co., 104 Wn. App. 338, 347-48, 16 P.3d 45 (2000).

Defendants' renewed motion was not a CR 59 motion for reconsideration but, rather, a renewed motion for a stay.[4]

### III

Defendants contend that the trial court erred by denying their renewed motion to stay discovery. This is so, they assert, because the trial court failed to correctly apply the Olympic Pipeline factors in light of the new evidence submitted in support of the renewed motion.

We review a trial court's determination on a motion to stay for an abuse of discretion. Olympic Pipeline, 104 Wn. App. at 348. An abuse of discretion occurs when the trial court's ruling is manifestly unreasonable or is based on untenable grounds or reasons. Olympic Pipeline, 104 Wn. App. at 348.

---

[4] The Investors contend that Defendants' renewed motion was a motion for reconsideration pursuant to King County Local Civil Rules 59 and 7(b)(6). But neither local rule relied upon by the Investors supports the understanding that the Defendants' motion was a motion for reconsideration in anything other than name. In any event, local rules cannot supersede or conflict with our Supreme Court's rules. CR 83; Iturribarria Perez v. Bazaldua Garcia, 148 Wn. App. 131, 140, 198 P.3d 539 (2009). Neither can local rules foreclose an established avenue of appellate relief. See Olympic Pipeline, 104 Wn. App. at 347-48 (reviewing petitioner's *renewed motion to stay discovery*). Rather, local rules must harmonize with the Supreme Court's rules to provide consistency throughout the state. Defendants' renewed motion is no more a CR 59 motion for reconsideration in King County than it is in any other county in the state.

"Whether a court abuses its discretion in controlling discovery depends on the interests affected and the reasons for and against the decision." Olympic Pipeline, 104 Wn. App. at 348.

We have recognized that parallel civil and criminal proceedings present a potential dilemma for trial courts.

> "On the one hand, a parallel civil proceeding can vitiate the protections afforded the accused in the criminal proceeding if the prosecutor can use information obtained from him through civil discovery or testimony elicited in the civil litigation . . . . On the other hand, the pendency of a parallel criminal proceeding can impede the search for truth in the civil proceeding if the accused resists disclosure and asserts his privilege against self-incrimination and thereby conceals important evidence."

Olympic Pipeline, 104 Wn. App. at 352 (quoting Parallel Civil & Criminal Proceedings, 129 F.R.D. 201, 202 (1990) (Pollack, J.)).

Accordingly, trial courts confronted with such a situation must conduct an on-the-record balancing of eight nonexclusive factors before granting or denying a motion to stay the civil proceeding. Olympic Pipeline, 104 Wn. App. at 352-53, 375. These factors include: the extent to which a party's right against self-incrimination is implicated in the civil proceedings; the similarities between the civil and criminal cases; the status of the criminal case; the plaintiffs' interests in expeditious litigation and potential prejudice; the burdens on the party asserting the privilege; the convenience and efficiency of the court; the interests of nonparties to the civil litigation; and the public interest in the civil and criminal litigation. Olympic Pipeline, 104 Wn. App. at 352-53.

The trial court herein made on-the-record findings as to each Olympic Pipeline factor in its order denying Defendants' first motion for a stay. However,

- 11 -

the trial court's order denying Defendants' renewed motion failed to analyze the relevant factors in light of the new information that Defendants gleaned following the denial of the first motion. As we discuss below, the balance of the relevant factors had changed by the time that Defendants filed the renewed motion. Each factor is addressed in turn.

## A

While the extent to which a party's right against self-incrimination is implicated in civil proceedings is not determinative, this factor "must be given 'serious consideration' in the balancing of interests." Olympic Pipeline, 104 Wn. App. at 353 (quoting White v. Mapco Gas Prods., Inc., 116 F.R.D. 498, 502 (E.D. Ark. 1987); Brock v. Tolkow, 109 F.R.D. 116, 120 (E.D.N.Y. 1985)).

The parties' dispute as to this factor focuses on whether Defendants are "witnesses," "subjects," or "targets" of the criminal investigation. In the renewed motion, Defendants provided a declaration from criminal counsel stating that two AUSAs confirmed that Defendants "were not being viewed as mere witnesses." Defendants also provided an e-mail from AUSA Susan Roe stating that criminal counsel "asked if their clients were viewed solely as witnesses. We said we could not commit to that status." Defendants assert that these statements establish that they are at least "subjects" of the investigation, if not "targets." Fairplay contends that no such inference can be drawn from the government's refusal to comment on the ongoing investigation.

But despite the reluctance of federal officials to openly confirm whether Defendants are actual subjects or targets of the ongoing criminal investigation,

- 12 -

"[t]here seems to be no serious dispute that [Defendants] are in genuine jeopardy of criminal liability." Olympic Pipeline, 104 Wn. App. at 354. Indeed, the Investors themselves alerted the USAO that Defendants may have doctored escrow agreements in violation of federal law. It is also undisputed that an FBI agent plans to attend the Garrison deposition. Based on this information, Garrison's criminal counsel advised him to assert his Fifth Amendment rights during the civil proceeding.

Although no individual defendant has been indicted in this matter—a fact that "makes more difficult the analysis of the potential criminal jeopardy"—an indictment is not necessary before a party's Fifth Amendment rights are implicated. Olympic Pipeline, 104 Wn. App. at 354. Indeed, "the protections of the Fifth Amendment turn not on whether a litigant has been indicted, but on whether the litigant is in real danger of self-incrimination in a subsequent criminal proceeding." Olympic Pipeline, 104 Wn. App. at 359. Here, Defendants' fears of self-incrimination are supported by the record. Accordingly, this factor weighs heavily in favor of a stay.

B

"One of the most important factors in the balancing process is 'the degree to which the civil issues overlap with the criminal issues,' because '[i]f there is no overlap, there would be no danger of self-incrimination and accordingly no need for a stay.'" Olympic Pipeline, 104 Wn. App. at 357 (alteration in original) (footnote omitted) (quoting Parallel Proceedings, 129 F.R.D. at 203; Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc., 886 F.

Supp. 1134, 1139 (S.D.N.Y. 1995); <u>Volmar Distribs., Inc. v. N.Y. Post Co., Inc.</u>, 152 F.R.D. 36, 39 (S.D.N.Y. 1993)).

Here, although the scope of the criminal investigation is unknown, the conduct alleged in the civil complaint is the same conduct that is under investigation by federal authorities. As discussed herein, the Investors themselves alerted the USAO that Garrison and Over allegedly doctored escrow agreements related to the Bank acquisition in violation of federal law. Moreover, the FBI's decision to send an agent to attend the Garrison deposition further indicates that evidence of criminal conduct may be discerned through civil discovery. <u>See</u> <u>Olympic Pipeline</u>, 104 Wn. App. at 358 ("The U.S. Attorney thus believes that evidence of criminal conduct may be found in the civil discovery. There appears thus to be complete correspondence between the civil and criminal cases."). This factor likewise weighs heavily in favor of a stay.

## C

The third factor in considering a stay request is the status of the criminal case. Although the argument for granting a stay is stronger when a party is under indictment, "the protections of the Fifth Amendment turn not on whether a litigant has been indicted, but on whether the litigant is in real danger of self-incrimination in a subsequent criminal proceeding." <u>Olympic Pipeline</u>, 104 Wn. App. at 359. But the absence of an indictment is not without consequence.

> The status of the criminal case includes the likely speed of its resolution. Where there is not yet a formal charge, resolution of the criminal matter may be so remote it should not be awaited. On the other hand, if the resolution of criminal proceedings is close at hand, the detriments of a stay are counterbalanced by the prospect

of a speedy criminal trial, and by the potential res judicata or collateral estoppel effects of resolution of common issues.

Olympic Pipeline, 104 Wn. App. at 359.

Here, as in Olympic Pipeline, Defendants have not been indicted. However, the record supports Defendants' contention that the criminal investigation may be resolved within the next six months. Counsel for Garrison was told by an AUSA that the USAO expects the criminal investigation to be completed within six months. An e-mail from AUSA Susan Roe similarly states that "many federal crimes have a five year statute of limitations and [] we certainly expect[] the investigation would be complete with the statute of limitations."[5] The relatively short time frame in which the criminal investigation is likely to be concluded weighs in favor of a stay.

## D

"Civil plaintiffs have a substantial interest in expeditious conduct of their litigation. That interest, and any potential prejudice from delay, must be carefully considered. Delayed resolution of the civil claims is, by itself, usually a detriment. In addition, delay carries with it the possibility of lost memories and missing witnesses." Olympic Pipeline, 104 Wn. App. at 359-60 (footnote omitted). "The consequences of delay usually depend upon its duration. If a brief, limited stay produces no clarification in criminal status, and other issues have not emerged to alter the balance, the court remains free to lift the stay and proceed." Olympic Pipeline, 104 Wn. App. at 361.

---

[5] The underlying conduct at issue occurred mostly in the summer of 2012.

Here, Defendants' first motion to stay discovery set no proposed duration. However, Defendants' renewed motion requested a limited stay of six months. A limited stay is unlikely to substantially prejudice Fairplay or the Investors in this matter and may clarify the nature and extent of the criminal investigation.[6] Should new information come to light regarding the extent and scope of the criminal investigation, the trial court may alter the length of the stay as appropriate. Accordingly, this factor weighs in favor of a stay.

E

"In addition to considering the implications of the Fifth Amendment privilege, courts consider 'the burden which any particular aspect of the proceedings may impose on defendants.'" Olympic Pipeline, 104 Wn. App. at 362-63 (quoting Fed. Sav. & Loan Ins. Corp. v. Molinaro, 889 F.2d 899, 903 (9th Cir. 1989)). This factor includes consideration of the burden associated with the simultaneous defense of civil and criminal proceedings and the likelihood that "materials unearthed during civil discovery may eventually inure to the benefit of the government prosecution." Olympic Pipeline, 104 Wn. App. at 363.

Once a witness in a civil suit has invoked his or her Fifth Amendment privilege against self-incrimination, the trier of fact is entitled to draw an adverse inference from the witness's refusal to testify. Olympic Pipeline, 104 Wn. App. at 355-56 (citing Ikeda v. Curtis, 43 Wn.2d 449, 458, 261 P.2d 684 (1953)). Moreover, invocation of the Fifth Amendment privilege may supply an avenue for

---

[6] Fairplay contends that even a six-month stay could become an indefinite stay as Defendants may request another stay following the six-month period. But this contention completely ignores that the trial court "has the power to control all aspects of this issue." Olympic Pipeline, 104 Wn. App. at 361.

investigation by prosecutors.[7] <u>Olympic Pipeline</u>, 104 Wn. App. at 364. Because Garrison plans on asserting his Fifth Amendment privilege should this matter proceed to trial prior to the completion of the criminal investigation, the potential burden on Defendants is high. Accordingly, this factor weighs heavily in favor of a stay.

F

The final three factors are (1) the convenience of the court in the management of its cases and the efficient use of judicial resources, (2) the interests of nonparties to the civil litigation, and (3) the public interest in the civil and criminal litigation. <u>Olympic Pipeline</u>, 104 Wn. App. at 365-67 (citing <u>Molinaro</u>, 889 F.2d at 903).

Here, these factors weigh both in favor of and against a stay. The trial court certainly has an interest in resolving this matter quickly, as do the nonparty Fairplay creditors who may benefit from a favorable outcome. But the public also has an interest in seeing that the integrity of the judicial system is maintained and that defendants in a civil suit are not unjustifiably exposed to criminal liability.

G

The <u>Olympic Pipline</u> factors are nonexhaustive—individual cases may present additional factors that weigh on a court's analysis. 104 Wn. App. at 349. Here, Defendants have proposed that the plaintiffs' own underlying criminal

---

[7] Because the right to remain silent in such circumstances must be invoked on a question-by-question basis, the fact that the witness either invokes the privilege or declines to do so as to any particular question may provide "a roadmap" for government investigators to follow.

conduct and their efforts to create and leverage Fifth Amendment issues in this litigation also weighs in favor of a stay.

The record supports Defendants' contention. It appears that Fairplay and the Investors actively concealed information from Defendants concerning the Investors' role in alerting the USAO regarding Defendants' asserted culpability in the Bank acquisition. Fairplay and the Investors contend that the scope and parameters of the criminal investigation are unknown, but it was the Investors themselves who helped shape the scope of that investigation through their involvement with the USAO. The Investors have exposed Defendants to criminal liability and now seek to leverage that liability against Defendants in the civil proceeding—forcing Defendants to assert their Fifth Amendment rights to their own detriment in the civil proceeding. These facts weigh in favor of a stay.

IV

Following Defendants' first motion to stay discovery, the trial court conducted an on-the-record balancing of all relevant Olympic Pipeline factors and found that the balance of equities weighed against a stay. Notably, the trial court found that no defendant planned on asserting his Fifth Amendment rights, that any similarities between the civil and criminal cases were unknown, that there was no evidence that the criminal investigation would be concluded anytime soon, and that Defendants would not be prejudiced by proceeding with the depositions.

But there is no serious dispute that the circumstances changed following the trial court's denial of the first motion to stay. As we recognized in Olympic

Pipeline, "[w]ith issues as complex as these, discovery management decisions are likely to be revisited as new events or the passage of time changes the picture." 104 Wn. App. at 376. Indeed, by the time that Defendants filed the renewed motion for a stay, (1) Defendants had discovered that the Investors had personally alerted the USAO of alleged criminal activity regarding the Bank acquisition, (2) Garrison planned on asserting his Fifth Amendment rights during the civil litigation, and (3) Defendants had reason to believe that the criminal investigation would be concluded within six months.

But the trial court failed to acknowledge or address these changed circumstances when it denied Defendants' renewed motion. Rather, the trial court simply restated some of its previous findings—finding that no defendant planned on asserting his Fifth Amendment rights, that the potential duration of the criminal investigation was unknown, and that the stay was potentially indefinite. Although the trial court was not obligated to conduct an entirely new, on-the-record balancing of each Olympic Pipeline factor, the trial court's order failed to account for the significantly changed circumstances discussed herein. These changed circumstances weigh heavily in favor of a stay. Thus, the trial court abused its discretion by not accounting for them and by not granting the motion.

We recognize that our discretionary review is of an interlocutory order. Should the parties present the trial court with new information that alters the balance of equities, the trial court retains complete control over the length and parameters of the stay.

Reversed.

We concur: