# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>MICHAEL E. MOCKOVAK,<br><br>　　　　　　　Petitioner. | No. 74576-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: May 6, 2019 |

APPELWICK, C.J. — In 2011, a jury convicted Mockovak of attempted first degree murder, solicitation to commit first degree murder, first degree theft, and conspiracy to commit first degree theft. This court affirmed the convictions on direct appeal and later denied his personal restraint petition. In this second petition, Mockovak argues that the State withheld material exculpatory information about the citizenship status of its key witness. And, he asserts that his trial counsel was ineffective. Because the petition is untimely and no exception to the time bar exists, we deny his petition.

## FACTS

In 2011, a jury found Michael Mockovak guilty of soliciting and attempting to murder his business partner, among other charges. Mockovak's convictions arose out of a joint federal-state investigation. Mockovak v. King Cty., No. 74459-3-I, slip op. at 2 (Wash. Ct. App. Dec. 19, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/744593.pdf. The joint investigation used a

confidential informant named Daniel Kultin, a Russian emigrant and Mockovak's employee. Id. The King County Prosecuting Attorney (KCPA) and the United States Department of Justice agreed that the State should prosecute Mockovak under state law. Id. at 3.

This court affirmed the judgment and sentence on appeal, and later denied his personal restraint petition (PRP). Id. at 2.

On November 20, 2013, shortly after the Supreme Court denied his petition for review of this court's decision in his direct appeal, Mockovak sent a Public Records Act[1] (PRA) request to the KCPA. State v. Mockovak, 178 Wn.2d 1022, 312 P.3d 650 (2013). Mockovak sought all documents in the KCPA's possession referring to Kultin. Mockovak then filed suit under the PRA against King County (County), alleging that he had not received any of the records that he requested. The County and the KCPA soon began providing records, but many were redacted to protect work product. Mockovak, No. 74459-3-I, slip op. at 3. The trial court granted summary judgment to the County and KCPA in November 2015. Id. at 4.

On Mockovak's appeal of the PRA case, this court stated,

> [T]he County and the KCPA argue that the documents at issue contain no information about Kultin's immigration status that Mockovak did not know already. Specifically, they highlight five factual matters for which Mockovak seeks evidence. First, Kultin was a lawful permanent resident at the time of trial rather than a U[nited] S[tates] citizen. Second, Kultin was in the United States on asylum status. Third, the Immigration and Naturalization Service (INS) arrested Kultin in 1997. Fourth, the United States never offered Kultin immigration assistance for his help as an informant and witness. Fifth, Kultin had an application for citizenship pending at the time of trial.

---

[1] Chapter 42.56 RCW.

<u>Mockovak</u>, No. 74459-3-I, slip op. at 36-37.

This court found,

The record shows that the State provided evidence of the first three facts to Mockovak. . . . Thus, Mockovak cannot show substantial need for documents evidencing these facts. Only the questions of when Kultin filed for citizenship and whether he received immigration assistance from the United States or the County remain at issue.

On May 26, 2010, the State provided documentation to Mockovak showing that Kultin had an immigration application pending in April 2009. Later, during this case, Kultin testified by deposition that he filed for citizenship again during 2011. Mockovak points to the crucial gap between the two dates and argues that the State never informed him whether Kultin had a citizenship application pending at the time of the criminal trial.

But Mockovak's theories on the nature of that gap are all speculative. He speculates that Kultin may have intended to file a new application after trial, capitalizing on the assistance he rendered the FBI [(Federal Bureau of Investigation)] and State. He also speculates that the 2009 application may have remained pending during trial or been denied before. He further speculates that Kultin may have lied in the deposition and that the County, the KCPA, or the United States might have known it. His theories all fail because they do not suggest that the County, the KCPA, or United States have any information beyond what they provided.

Regarding the possibility that Kultin obtained assistance from the [Department of Justice] or King County, the County and the KCPA argue that they already gave Mockovak complete information about any potential immigration assistance offered to Kultin. Specifically, they point to Carver's declaration of December 3, 2010 and a letter from the KCPA to defense counsel on May 10, 2010. Carver and the author of the letter averred that Kultin did not receive any promise of immigration assistance for his testimony. The County and the KCPA also highlighted Kultin's testimony that he had participated in the investigation to do the right thing. Again, Mockovak can only speculate that these statements were disingenuous but his speculation falls below the substantial need he must demonstrate.

<u>Id.</u> at 37-38.

Mockovak filed this second PRP on September 22, 2015, while the public records challenge was ongoing. He argues that, in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the State failed to disclose material exculpatory evidence regarding Kultin's immigration status to the defense, and that trial counsel was ineffective for failing to cross-examine Kultin on this issue. This court granted a stay of the petition pending judgment in the PRA case. Mockovak lost on appeal of his PRA claim. Mockovak, No. 74459-3-I, slip op. at 44. The stay was lifted and this court directed the State to respond to the PRP.[2]

## DISCUSSION

The State argues initially that Mockovak's petition is untimely under RCW 10.73.090.

A personal restraint petition normally must be filed within one year after the judgment and sentence becomes final. RCW 10.73.090. In this case, the judgment and sentence became final on December 4, 2013, when the Washington Supreme Court issued its mandate terminating Mockovak's direct appeal. Therefore, the one year time period expired on December 4, 2014. Mockovak concedes that he filed this personal restraint petition after that expiration date, in September 2015.

---

[2] At oral argument on February 26, 2019, Mockovak's counsel gave the court a document entitled "Index to Exhibits with Partial Timeline Major Events." Arguing that the materials are improper under RAPs 10.1(a), (b), and (h), 10.2, 10.3, and 10.7, the State moved to strike the materials. To the extent the materials presented at oral argument were not in the record, they will be ignored by the court. The motion to strike is denied.

I. Equitable Tolling

Mockovak argues that his petition may proceed because of equitable tolling.

Equitable tolling is a remedy that permits a court to allow an action to proceed when justice requires it, even though a statutory time period has elapsed. In re Pers. Restraint of Bonds, 165 Wn.2d 135, 141, 196 P.3d 672 (2008). Equitable tolling is a "narrow doctrine to be used only sparingly and not applicable more generally to 'garden variety' claims of neglect." In re Pers. Restraint of Haghighi, 178 Wn.2d 435, 447-48, 309 P.3d 459 (2013).

The plurality opinion in Bonds held that equitable tolling may be applied to the one-year time bar in RCW 10.73.090, but that it did not apply to Bonds because he failed to show (1) bad faith, deception or false assurances by the State, and (2) the exercise of diligence by the petitioner. 165 Wn.2d at 141, 143-44. Four justices signed the opinion. Id. at 144. In a separate concurrence, two justices found that "equitable tolling may apply in circumstances other than where bad faith, deception, or false assurances are present," but that the facts in the present case did not justify tolling. Id. The concurrence stated,

> [T]he 10-month delay by the Court of Appeals in acting on Bonds's personal restraint petition was not an extraordinary circumstance and certainly is far less egregious than the circumstances in State v. Littlefair, 112 Wn. App. 749, 51 P.3d 116 (2002), and In re Personal Restraint of Hoisington, 99 Wn. App. 423, 993 P.2d 296 (2000).

Id. at 144-45. In Haghighi the court reiterated,

> Although this court has not previously settled what standard should be applied in this context, traditionally we have allowed equitable tolling when justice requires its application and when the predicates of bad faith, deception, or false assurances are met, and where the petitioner has exercised diligence in pursuing his or her rights.

178 Wn.2d at 447.

Mockovak asks this court to rule that he timely filed his petition, because the one year statute of limitation was equitably tolled until "at least October 29, 2014." This is the date Mockovak states that the prosecuting attorney finished responding to his PRA request, and gave him the last installment of redacted records. Mockovak asserts that he was given false assurances, that law enforcement agents acted in bad faith, and that he was deceived. Mockovak further claims that before and after his criminal trial, he diligently attempted to discover the true facts about Kutlin's immigration and citizenship status.

## II.   Bad Faith, Deception, or False Assurances

Mockovak argues that the State violated the due process rule of Brady and Giglio[3] by failing to disclose Kultin's pending citizenship application, the nature of his prior INS arrest, and the fact that he was suspected of entering the United States fraudulently. Mockovak argues that the redacted records produced in the PRA case show that Brady/Giglio information was improperly withheld.

The suppression of evidence that is both favorable to a criminal defendant and material to either guilt or punishment is a violation of due process, regardless of the good or bad faith of the prosecution. Brady, 373 U.S. at 87. This includes evidence that may be used to impeach a witness's credibility. Giglio, 405 U.S. at 154-55. A Brady violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is

---

[3] Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. Strickler v. Green, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case. United States v. Kohring, 637 F.3d 895, 905-06 (9th Cir. 2010).

A. State's Initial Description of Kultin

Mockovak asserts that some details about Kultin's status were originally misreported. Mockovak alleges that he was initially told that Kultin was a United States citizen, when he was not. Then, he asserts that he found out 11 months after he was charged that Kultin was a lawful permanent resident who had been granted asylee status in 1997.

This court has previously found that the State provided evidence to Mockovak before trial that (1) Kultin was a lawful permanent resident at the time of trial rather than aUnited States citizen, (2) Kultin was in the United States on asylum status, and (3) INS arrested Kultin in 1997. Mockovak, No. 74459-3-I, slip op. at 36-37. Kultin's actual status was disclosed to Mockovak before trial. There is no basis to find that the State acted in bad faith, deceived, or made false assurances because it initially stated that Kultin was a citizen, but then corrected itself and informed Mockovack of Kultin's immigration status before trial.

B. Asylum Status

Next, Mockovak argues that it was never disclosed that there was "reason to believe" that Kultin had entered the United States fraudulently, by falsely claiming that he needed political asylum.

Mockovak cites to Kultin's deposition to support his claim that there was reason to believe that Kultin entered the United States fraudulently. In the deposition taken on July 24, 2015, Kultin stated that he first came to the United States in 1994, when he joined his father. When asked what his immigration status was when he first came, Kultin said, "I remember I was part of my father's immigration status." The deposer asked, "What does that mean 'part' of your father's status?" Kultin responded, "As far as I know I was his son being included in his immigration process."

When asylum was raised, there was this exchange:

Q. Okay. Why did you need asylum?

A. As far as I know, I was part of my father's immigration process.

Q. Why did you need asylum?

A. My father included me in his immigration papers.

Q. I'm asking about you. Did you need asylum?

A. I think that's a better question for my father.

Q. I don't. I'm asking about you. You didn't need asylum; did you?

A. I have a feeling you're trying to make me guilty of something, so I'm not going to answer this, and again, refer you to my father.

The questions and answers continued in this manner. The deposer later asked, "The United States says that when you came to this country you were granted

asylee status. Do you still have asylee status today?" Kultin responded, "As far as I know, I'm a U[nited] S[tates] citizen." Kultin stated that he became a United States citizen in 2011, sometime after the trial in which he testified was over. He said that he was a green card holder for at least five years before he applied for citizenship. He said that there was never a time when someone suggested or accused him of getting his green card fraudulently.

Mockovak asserts that Kultin lied about needing asylum status because, during his deposition, he refused to answer the question. He argues that this court can infer that Kultin's truthful answer would show that Kultin had committed a crime when he got his asylum status.

Once a witness in a civil suit has invoked his or her Fifth Amendment privilege against self-incrimination, the trier of fact is entitled to draw an adverse inference from the refusal to testify. King v. Olympic Pipeline Co., 104 Wn. App. 338, 355-56, 16 P.3d 45 (2000). "In a civil proceeding such an inference is permissible, where appropriate, not as a sanction or remedy for any unfairness created by exercise of the privilege but simply because the inference is relevant and outside the scope of the privilege." Diaz v. Wash. State Migrant Council, 165 Wn. App. 59, 86, 265 P.3d 956 (2011) (emphasis added).

During the deposition, Kultin stated that he was part of his father's immigration process to the United States. He immigrated when he was 18, and, at the deposition, stated that he did not remember much during that time. Kultin also appeared to be distrustful of the deposer. When Kultin told the deposer that asylum status was a better question for his father, the deposer asked, "I don't. I'm

asking about you. You didn't need asylum; did you?" Kultin responded, "I have a feeling you're trying to make me guilty of something, so I'm not going to answer this, and again, refer you to my father." His statements that he did not remember much but believed he was part of his father's application suggest that he did not have the answer. He referred the questioner to a source he believed had the answer. He declined to speculate on the answer fearing trickery by counsel. Nothing indicates that he had additional knowledge with which to respond. This is qualitatively different from an assertion of a right to not answer a question to which he had the answer but it would be incriminating. The court is not required to draw an adverse inference from his refusal to provide a further response. See Diaz, 165 Wn. App. at 86.

Even if this court were to draw a negative inference from Kultin's refusal to answer the question, the inference would not establish a fact of illegal immigration status. And, it is not a sufficient basis to find that the State knew about or withheld information at the time of Mockovak's trial that Kultin entered the United States fraudulently.

In his deposition, Kultin never said that he entered the United States fraudulently, and there is no evidence of this claim in the deposition to which Mockovak cites. If the State had no "reason to believe" Kultin committed fraud when he entered the United States, there was nothing to be "disclosed." We cannot find that the State failed to act, let alone acted in bad faith, deceived, or made false assurances because it did not tell Mockovak that there was "reason to believe" that Kultin entered the country fraudulently.

C. <u>INS Arrest</u>

Mockovak asserts that his counsel was not told until one month before trial that Kultin had been arrested by the INS, and that he was never told the basis of the arrest. For support, in addition to Kultin's deposition, Mockovak cites an April 10, 2009 FBI report by George Steuer. The Steuer report states that Kultin was once arrested by immigration officials, and that the case was dismissed.

The State disclosed evidence to Mockovak before trial that the INS arrested Kultin in 1997. <u>Mockovak</u>, No. 74459-3-I, slip op. at 36-37. Specifically, in a declaration filed on December 3, 2010, Detective Len Carver wrote,

> I am familiar with Kultin's criminal and arrest history report, which reflects only one arrest. That arrest was on January 17, 1997, by U[nited] S[tates] Customs, Immigration and Naturalization (INS) Service. Kultin has no known criminal convictions.
>
> I have reviewed Department of Homeland Security documentation and know that Kultin is a legal permanent resident of the United States. Kultin's records indicate he has been a permanent resident since 2004. As proof of that status, Kultin was issued a permanent resident card, commonly called a "green card" in 2005. Kultin would not be subject to deportation unless he was first convicted of certain types of crimes.
>
> During my interactions with Kultin, he never expressed any concerns about his standing with INS.

Mockovak could have inquired further about the nature of the arrest and the disposition before or during the trial. He did not.

At his deposition in 2015, Kultin acknowledged that he was arrested by INS, but that he had "legal immigration status" at the time of the arrest, and that it was a misunderstanding. He said that he did not remember with what he had been charged.

Mockovak has not provided evidence that KCPA knew the nature of the INS arrest and failed to disclose it. The implication of the inquiry is that Kultin was in the United States illegally. Certainly, the INS had the opportunity to ascertain if Kultin had entered the country fraudulently when he was arrested, but rather than prosecute, they released him. The record discloses no reason the State had to believe Kultin was here illegally. Thus, there is no basis on which to find that the State acted in bad faith, deceived, or made false assurances in not disclosing what it did not know.

D. Application for Citizenship

Mockovak claims "it was never disclosed that Kultin either had an application for citizenship pending at the time of Mockovak's trial, or, alternatively that Kultin intended to file an application for U[nited] S[tates] citizenship as soon as Mockovak's trial was finished." Finally, he asserts that it was not disclosed that Kultin was granted United States citizenship after Mockovak's trial finished.

The April 2009 Steuer report states that Kultin "is currently in the application process" to become a United States citizen. This court previously found that, before trial, the State provided documentation to Mockovak showing that Kultin had an immigration application pending in April 2009. Mockovak, No. 74459-3-I, slip op. at 37. Kultin filed for citizenship again during 2011. Id.

In Kultin's deposition, he was asked, "Did you tell any law enforcement officer that you had an application pending?" Kultin answered, "Not that I remember." When he was asked if he told anyone at the FBI if he had a citizenship application pending, Kultin answered, "I don't remember saying that." Kultin stated

12

that his "application for citizenship didn't happen until sometime later [after the trial]."

Whether the FBI learned of Kultin's application for citizenship from Kultin or elsewhere is of no consequence. The fact that Kultin had applied for citizenship was disclosed to Mockovak before trial.

As this court previously found in his PRA case, Mockovak's theories on the nature of the gap between his 2009 application and his 2011 application are all speculative. Id. at 37-38. And, this court also found that law enforcement, KCPA, and Kultin all stated that Kultin did not receive any promise of immigration assistance for his testimony in the case. Id. at 2, 38.

Specifically, this court stated,

> Carver and the author of the letter averred that Kultin did not receive any promise of immigration assistance for his testimony. The County and the KCPA also highlighted Kultin's testimony that he had participated in the investigation to do the right thing. Again, Mockovak can only speculate that these statements were disingenuous but his speculation falls below the substantial need he must demonstrate.

Id. at 38.

Mockovak argues that the redacted records produced in the PRA case show that Brady/Giglio information was improperly withheld. In the 2015 PRA case, the County and the KCPA provided records, many of which were heavily redacted. Id. at 3. Mockovak argued that the documents were improperly redacted. Id. The KCPA moved for summary judgment, and filed sealed and unredacted copies of 130 documents for in camera review. Id. The trial court ultimately granted

summary judgment to the County and KCPA. Id. at 4. The unredacted documents were not disclosed. See id. at 21-22.

In that case, Mockovak argued that redacted documents labeled "26, 77, and 99" must be disclosed by the County in full. Id. at 38. Mockovak speculated that the documents, which "the County concede[d] involved 'immigration-related fact[s] concerning Kultin'" contained evidence of some immigration assistance offered by the United States. Id. (second alteration in original). In rejecting Mockovak's argument, this court stated, "The documents contain no such information but only incidental facts already disclosed to Mockovak well before the criminal trial." Id. In the context of the PRA, the court evaluated the redacted records, and found that they did not show that the State withheld information from Mockovak relevant to Kultin's immigration status or application for citizenship. Id. at 35-38.

As evidence that the State offered some sort of assistance to Kultin, Mockovak also points to an e-mail exchange between the prosecutor's office and an Immigration and Customs Enforcement (ICE) agent. Mockovak argues that the exchange suggests that the prosecutor was worried that Kultin was in danger of losing his green card status. And, he asserts that the e-mails indicate that the prosecutor was trying to determine if Kultin was still seeking citizenship, so that she could see whether law enforcement could assist him in obtaining it.

In one e-mail, the ICE agent sent the prosecutor a link to the United States Customs and Immigration Services website, and attached three documents that can be found at the website. The documents provide information about what a

green card is, rights and responsibilities of a permanent resident, and warns green card holders about acts that might cause them to lose their green card status. The prosecutor sent an e-mail thanking the ICE agent, and the rest of the e-mail—a couple of lines—is redacted.

These e-mails show that the ICE agent provided the prosecutor with publicly available information regarding a green card holder's status, not Kultin's status. They do not show that the State offered any sort of promise or assurance to assist Kultin in obtaining citizenship.

Mockovak also argues that the FBI assigned a victim specialist to provide "assistance" to Kultin. Mockovak cites e-mails in which the prosecutor states that she is going to tell Kultin's attorney "to expect her assistance," and another e-mail to Kultin explaining who the "victim specialist" is. These e-mails do not show any communication between the "specialist" and Kultin, and this court has no basis to infer that the specialist offered Kultin assistance with his citizenship status.

Finally, during the trial, the KCPA provided Mockovak's counsel with a memo affirming that there were no promises to assist with Kultin's immigration status. Mockovak's counsel stated on the record, "I am satisfied that—we were given a two-page memo that makes statements about assistance—or lack of assistance with any immigration issue." And, Mockovak's counsel stated, "I have no reason to doubt the accuracy of that information, and assuming that information is complete . . . we have been provided the information."

Mockovak has not met the high burden of demonstrating that his second PRP was untimely due to bad faith, deception, or false assurances. The narrow

equitable tolling exception does not apply. Therefore, Mockovak's petition was untimely and we deny his petition.[4]

WE CONCUR:

---

[4] Mockovak also argues that trial counsel's failure to question Kultin about his immigration and citizenship status both pretrial and during the trial deprived him of his right to effective assistance of counsel. As Mockovak's second PRP was untimely, we do not reach the merits of his ineffective assistance claim.